158 F.3d 768
 Inez SALES; Debra M. Miller, Plaintiffs-Appellants,
v.
Alphonso L. GRANT; John E. Mason, Jr., in their individual
capacities and in their official capacities as members of
the city of Lynchburg Electoral Board; David T. Petty, Jr.,
in his official capacity as a member of the City of
Lynchburg Electoral Board; Carol Spencer Read, Defendants-Appellees,
and
City of Lynchburg Electoral Board, Defendant.
 No. 97-1496.
 United States Court of Appeals,
Fourth Circuit.
 Argued Jan. 28, 1998.
Decided Oct. 14, 1998.
 
 ARGUED: David Edward Constine, III, Mays & Valentine, L.L.P., Richmond, VA, for Appellants. Bradley Brent Cavedo, Shuford, Rubin & Gibney, P.C., Richmond, VA, for Appellees. ON BRIEF: Anthony F. Troy, Claudia T. Salomon, Mays & Valentine, L.L.P., Richmond, VA, for Appellants.
 Before WILLIAMS, Circuit Judge, PHILLIPS, Senior Circuit Judge, and FOX, Chief United States District Judge for the Eastern District of North Carolina, sitting by designation.
 Affirmed in part and reversed and remanded for a new trial by published opinion. Senior Judge PHILLIPS wrote the opinion, in which Judge WILLIAMS and Chief Judge FOX joined.
 OPINION
 PHILLIPS, Senior Circuit Judge.
 
 
 1
 This is an appeal by Debra Miller and Inez Sales, former Assistant Registrars of the City of Lynchburg, Virginia, from a judgment dismissing their action under 42 U.S.C. § 1983 (1994) in which they claimed that members of the Lynchburg Electoral Board violated their constitutional rights by causing them not to be reappointed because of their political affiliations. They principally challenge the district court's dismissal of their claims as a matter of law for failure of proof in their jury trial. They also challenge the court's refusal to apply offensive collateral estoppel to establish the fact of unconstitutional motive for a related non-reappointment decision and the trial judge's refusal to recuse himself for revealed bias. Because we conclude that the court erred in dismissing the claims as a matter of law for failure of proof, we vacate the judgment and remand for a new trial. Because resolution of the collateral estoppel issue could affect a re-trial, we address it and find no abuse of discretion in the district court's refusal to apply it under the circumstances. In view of our vacatur of the judgment on other grounds, we consider it unnecessary to address the recusal issue as it might have affected the judgment appealed, but observe that our declination to address it is without prejudice to the right of Miller or Sales to renew their recusal motion upon remand if so disposed.
 
 I.
 
 2
 In late 1993, Republican George Allen was elected Governor of Virginia replacing incumbent Democrat Douglas Wilder.[1] At the time, Linda Arnold was the General Registrar of the City of Lynchburg and Miller and Sales were employed as her Assistant Registrars. Arnold had been appointed in 1983 after the gubernatorial election of Democrat Charles Robb and had selected Sales as Assistant Registrar in 1985 and Miller in 1991. All three had then served continuously until 1995.
 
 
 3
 In Virginia, a general registrar is appointed for a four-year term by the electoral board of each county or city. Va.Code § 24.2-110. Electoral boards are composed of three members, who are appointed based on the political party that they represent. Id. § 24.2-106. The composition of each board is dictated by the political affiliation of the governor currently in office; specifically, the party winning the previous gubernatorial election is entitled to two of the three electoral board seats with the remaining seat being filled by the political party garnering the second highest number of votes for the governorship. Id.
 
 
 4
 Based on the staggered three-year terms of the board members and the term length for the registrar, the newly-constituted board appoints a registrar in the second March after the election of the governor. The electoral board also is empowered to set the number and terms of assistant registrars for its county or city. Id. § 24.2-112. However, the registrar, and not the electoral board, appoints the assistant registrars. Id.
 
 
 5
 When Governor Allen was elected, John E. Mason, Jr. was the lone Republican representative on the Lynchburg Electoral Board. Under the "to the victor goes the spoils" arrangement, Samuel Snow was appointed as the second Republican Board member in March 1994 replacing a Democratic appointee. The other Democratic member, David T. Petty, Jr., remained on the Board.
 
 
 6
 Within days after Governor Allen's election, Mason attended a meeting with then Chairman of the Lynchburg Republican Committee, Michael Harrington, and then Republican delegate to the Virginia House of Delegates, Stephen Newman, to discuss prospects for Registrar candidates now that a Republican governor had assumed office for the first time in twelve years. (J.A. at 612.) At that meeting, words were used to the effect that "George Allen has won and we get to occupy the registrar's office." (Id. at 614.)
 
 
 7
 On March 10, 1994, Mason contacted Louise B. Plecker, the Registrar of Bath County, to discuss matters including the Lynchburg Registrar position. (Id. at 237.) During the course of the conversation, Mason informed Plecker that Arnold was a good Registrar and was performing admirably, but that he wanted to replace her somehow. (Id. at 238.) Plecker responded that the appointment of registrar could no longer be dictated by party affiliation and promptly ended the discussion. (Id. at 239.)[2]
 
 
 8
 Around this time, Mason confronted Arnold and asked her whether, under the new circumstances, she was going to seek reappointment. (Id. at 607.) By this, he was referring to the new circumstances that there was a new Republican governor; that Arnold's term was coming to an end; and that there would be a Republican Electoral Board majority. (Id. at 608.) At the time, Mason knew that Arnold was the Democratic Party's choice for Registrar. (Id. at 601-02.)
 
 
 9
 In August 1994, Arnold received a letter from Robert Garber, the then Chairman of the Lynchburg Republican Committee, accusing Arnold and her office of engaging in partisan politics. (Id. at 1034.) Specifically, Garber claimed that the Registrar's office had refused to provide a requesting constituent with the telephone number for the Republican Party headquarters. (Id.) Garber's letter asserted that Arnold "and [her] office operated in a partisan Democratic manor [sic]. If the allegations are true it would represent concern to the integrity of the office. Therefore, I would ask that in the future Republicans receive the same type of treatment as their Democratic counterparts." (Id.) Arnold forwarded a copy of the letter to Mason and both conducted inquiries into its validity. (Id. at 604, 688.) Mason understood the reference to Arnold's "office" to mean Miller and Sales. (Id. at 689-90.) His inquiries led him to believe that Garber's accusations were groundless. (Id. at 604, 690-91, 695-96.)
 
 
 10
 In January 1995, Mason met with several Republican delegates to discuss how not to reappoint Arnold. (Id. at 629-30.) At the meeting, he solicited guidance about how to proceed without violating the law. (Id.) Following this meeting, Mason suggested to fellow Board members Snow and Petty that the Registrar position be advertised. (Id. at 275-76.) When neither immediately agreed with Mason, the three Board members decided to delay further discussions on the issue until the Board's next meeting. (Id.) After speaking privately with Mason and Alphonso L. Grant, an active supporter of Republican political causes, Snow resigned before the scheduled Board meeting because of general pressure or stress surrounding the reappointment decision. (Id. at 265-66.) Grant was selected to replace Snow on the Board and immediately voted with Mason to advertise the Registrar position.
 
 
 11
 After initiating the advertising, the Board enlisted the City of Lynchburg Personnel Department to handle incoming applications. (Id. at 537.) The Personnel Department then narrowed the field by suggesting nine final candidates for interview. (Id.) Of these final nine applicants, at least two, Carol Spencer Read and Dori Harvey, had been specifically solicited by Grant to submit applications. (Id. at 703-06, 753-55.) With regard to Harvey, Grant solicited her application through her father, Chip Harvey. Prior to speaking with Chip Harvey, Grant had seen him at Republican functions including fundraisers for political candidates. (Id. at 704.) When Dori Harvey submitted her application, it also was accompanied by an endorsement letter from Flo Traywick, a prominent Lynchburg Republican who served as a National Republican Committee Woman. (Id. at 670-71.)
 
 
 12
 During the Personnel Department's involvement in the initial screening process, Robert Chambers was the employee primarily responsible for evaluating the applicants. (Id. at 786.) Grant, as liaison for the Board, was the sole member of that group dealing with Chambers at this time. (Id. at 787.)
 
 
 13
 On March 22, 1995, the Personnel Department Selection Committee sent the Electoral Board a memorandum regarding the Registrar position that read as follows: "Two candidates, Lori Nuckles and Dori Harvey, were included; however, in our opinion, both would best be suited in the Assistant Registrar position...." (Id. at 1063.) Chambers later testified at trial that he created this memorandum at Grant's direction and inserted language from a draft copy supplied by Grant. (Id. at 795.) He asserted that before receiving Grant's draft he had never been asked to evaluate the candidates for possible employment as an Assistant Registrar. (Id. at 796.) He further testified that he prepared the memorandum solely because of Grant's direction and did not intend it to be any kind of recommendation from the Personnel Department about the position of Assistant Registrar.[3] (Id. at 797, 807.)
 
 
 14
 On March 28, 1995, Mason faxed Grant a copy of the Garber letter accusing Arnold, Miller, and Sales of engaging in political favoritism. The next day, the Electoral Board, by a vote of 2-1 with Mason and Grant voting together, opted not to reappoint Arnold and, instead, selected Carol Spencer Read to fill the position.
 
 
 15
 By Mason's admission, in the course of interviewing applicants for the Registrar position, the Electoral Board on which he and Grant then sat also had concerned itself with the Assistant Registrar position, despite Mason's knowledge that appointments to that position were not within his or the Board's prerogative. (Id. at 642, 654.) And, upon notifying Read of her selection on March 29, Mason volunteered that she should consider how to treat the Assistant Registrar positions. (Id. at 450-51.) Before Mason's call, Read had not thought about the subject and, in fact, was not even aware that the Registrar officially appointed the Assistant Registrars. (Id.) Mason informed her that she had several options including: (1) run the office by herself; (2) reappoint Miller and Sales; or (3) "take the recommendations the Personnel Department had given the Board." (Id. at 998-99.) In the course of this discussion, Mason advised Read that several problems could arise if Miller and Sales were retained. (Id. at 469, 999-1000.) Particularly, because of their loyalty to Arnold, they "could still correspond with [Arnold] and they could give her information as far as what [Read] was doing in[her] office, that type of thing." (Id. at 1000.) According to Mason, potential problems from their reappointment included leaking, sabotaging, and unfriendliness. (Id. at 469-70, 1000.)
 
 
 16
 Mason then explained to Read the Personnel Department's recommendations of Harvey and Nuckles that were contained in the March 22 memorandum. (Id. at 471.) In later deposition testimony, Read asserted that she "relied upon [the recommendation] very much so because I felt comfortable if the Personnel Department in a major city has screened an individual and made their recommendation, who am I to say that it's not so. So, yes, I took their recommendation very highly." (Id.) She also testified in that deposition that, when Mason explained her options, "I didn't know much of what was going on. I didn't understand." (Id. at 470.)
 
 
 17
 According to Read, when she was later informed by either Mason or Grant that Nuckles had withdrawn,[4] she assumed that "that narrowed the field down to just Dori." (Id. at 1003-04.) In testimony read to the jury from an earlier trial, she had elaborated on this point: "I believe it was Mr. Grant who said that personnel had interviewed nine people and that of the nine, two were not qualified to be registrar, but would make good assistant registrars and of those two, one withdrew or was not eligible because her husband is already a constitutional officer. That left Ms. Harvey. I had no choice."[5] (Id. at 1006.)
 
 
 18
 On the same day that Mason notified Read of her appointment as Registrar, Mason and Grant arranged for Read to meet them, along with Dori Harvey and Chip Harvey, at the Piedmont Club for cocktails. (Id. at 488-89.) At the Club, Read was introduced to Dori Harvey for the first time. (Id.) The next day, Harvey accompanied Read to the Registrar's office and was introduced as Read's assistant during the transition. (Id. at 489.)
 
 
 19
 Later that afternoon, Mason delivered a copy of the minutes of the previous day's Electoral Board meeting to Arnold. (Id. at 149.) This version of the minutes stated that Mason "was directed to notify Linda Arnold and her two assistants that they would not be re-appointed.... That notice was provided to Arnold via the attached March 29, 1995 memo, and is herewith provided to Arnold so that she may notify her assistants that the end of their terms coincide with hers." (Id. at 1036.) Mason also then expressly told Arnold "to make sure that [she] let the girls, you know, notify them of their status." (Id. at 151.) When Arnold informed Miller and Sales of the content of the memo, both became very upset and went to speak with the City of Lynchburg Personnel Director about other available positions. (Id. at 153, 317.)
 
 
 20
 Mason later conceded that the language in the minutes concerning the Assistant Registrars was inaccurate and that no discussion about their reappointment or termination occurred at the meeting because it was beyond the Board's authority. (Id. at 683.) On April 24, 1995, he amended the minutes to reflect that no decision about the Assistant Registrars was made at the March 29 meeting. (Id. at 1062.)
 
 
 21
 On March 31, it having been decided in the interval that Read needed only one assistant, Harvey was officially appointed Assistant Registrar. Before the appointment, Read had not requested any personal references or reviewed Harvey's application, but later testified that she had spent a considerable amount of time with Harvey that demonstrated that her personality was well-suited for the job. (Id. at 494-96, 976, 980, 983-84, 1001.) Read also testified that she was not impressed with Miller or Sales because they never asked to speak with her about reappointment, Arnold never mentioned anything about their job performance, and she perceived them as rude during her office visits. (Id. at 484-86, 979-80, 990.)
 
 
 22
 Miller and Sales denied in trial testimony that they were ever discourteous to Read on these occasions. Instead they asserted that in fact they never had the chance to speak with Read because during her office visit following her appointment, she spent her time in Arnold's office. (Id. at 319-20.) Both also testified that they assumed they should wait for the positions to be advertised as had been the process for selecting Read as Registrar. Finally, according to Miller and Sales, they proceeded on the assumption that, as reflected in the Board minutes delivered on March 30, their employment as Assistant Registrars had been officially terminated. (Id. at 316, 390.)
 
 
 23
 Following her replacement as Registrar, Arnold sued Mason and Grant in an earlier action under § 1983 claiming that they had replaced her because of her political affiliation in violation of her constitutional rights. Following a jury trial, the jury returned a verdict in favor of Arnold finding that she was not reappointed because of her association with the Democratic Party, and awarding her $150,000 in damages. Before the court heard Arnold's motion for reinstatement as a further remedy, the parties settled the case.
 
 
 24
 Miller and Sales then brought this § 1983 action against Mason, Grant, Petty, Read and the Electoral Board on comparable claims of unconstitutional conduct in causing them not to be reappointed because of their political affiliation.[6] Relying on the Arnold jury verdict, Miller and Sales moved in limine for an order establishing as a matter of offensive collateral estoppel that Mason and Grant had replaced Arnold because of her political affiliation. They later moved pre-trial to recuse the presiding judge based on allegedly biased statements he had made at a discovery hearing. Following a consolidated hearing on the motions, the district court denied both.
 
 
 25
 A four-day jury trial then ensued on Miller's and Sales's claims. At the close of the evidence, Mason and Grant moved for judgment as a matter of law pursuant to Rule 50(a) of the Federal Rules of Civil Procedure. Responding to movants' argument that Read made the reappointment decisions of "her own mind, without influence," (id. at 1010), Miller and Sales argued that Mason and Grant had arranged for Read to have only one choice. That even if Read may not herself have been motivated by political considerations, her decision was essentially preordained by the manipulations of Mason and Grant who plainly were so motivated, and who effectively caused Read to give effect to their politically-motivated purpose.
 
 
 26
 In a critical ruling, the district court disagreed.
 
 
 27
 Responding to counsel's contention for Miller and Sales that Mason and Grant had "poisoned the well," effectively directing Read's actions, the court opined: "Not to a person over eighteen years old that has her own mind.... [I]f her mind could be that easily poisoned then she shouldn't have been appointed Registrar, and I don't think it was." (Id. at 1014-15.) The court then explained its conclusion that Miller and Sales had not made out a prima facie case of unconstitutional politically-motivated conduct on the part of Mason and Grant.
 
 
 28
 In order for the case to be submitted to the jury the plaintiffs must produce some evidence to show that the defendants Mr. Mason and Mr. Grant were responsible for the plaintiffs not being reappointed to the position of assistant registrars and that a substantial or motivating factor for plaintiffs not being reappointed was their political beliefs or affiliations.
 
 
 29
 There is no evidence to support either element. The court is of the opinion that plaintiffs have failed to make out a prima facie case to go to the jury. This is not the ordinary case of a firing or failure to reappoint because of political beliefs.
 
 
 30
 The party responsible for the election of the assistant registrars is not a defendant in her individual capacity. The plaintiffs claim that it is the defendants Mr. Grant and Mr. Mason who have wronged them, not Mrs. Read....
 
 
 31
 The newly appointed General Registrar had the legal right to appoint whomever she chose to employ. She had no duty to employ the plaintiffs so long as it was not for the wrong reason, in this case political affiliation.
 
 
 32
 No evidence that either defendant, Mr. Mason or Mr. Grant, exercised any undue influence over the new General Registrar as to whom she would appoint.
 
 
 33
 There's no evidence that Mrs. Read knew anything about the political affiliation of either of the plaintiffs. She had every legal right to employ someone other than the plaintiffs if she had a reasonable doubt about their loyalty to her as the new Registrar.
 
 
 34
 ....
 
 
 35
 There was nothing wrong with Mr. Mason or Mr. Grant giving the Registrar advice so long as she felt no obligation to act on such advice. The evidence is that Mrs. Read made the actual choice without any limitation or pressure from anyone.
 
 
 36
 (Id. at 1028-29.) Based on this reasoning, the court granted the motion for judgment as a matter of law for insufficiency of proof. This appeal followed.
 
 II.
 
 37
 Miller and Sales challenge the district court's grant of judgment as a matter of law for insufficiency of evidence, the court's denial of their in limine motion for application of collateral estoppel, and the court's denial of their recusal motion. We take these in order.
 
 A.
 
 38
 We review the district court's Rule 50(a) ruling de novo to determine whether the evidence, viewed in the light most favorable to Miller and Sales, would have permitted a jury reasonably to return a verdict in their favor. See Andrade v. Mayfair Mgmt., Inc., 88 F.3d 258, 261 (4th Cir.1996). This requires that we give Miller and Sales, as non-movants, the benefit of every reasonable inference that could be drawn from the evidence, neither weighing the evidence nor assessing its credibility. See Al-Zubaidi v. Ijaz, 917 F.2d 1347, 1348 (4th Cir.1990). We may then affirm the district court's grant of judgment for Mason and Grant only if, by our assessment, the only conclusion a reasonable jury could draw from the evidence was in their favor, see Winant v. Bostic, 5 F.3d 767, 774 (4th Cir.1993), but we must reverse if, on the other hand, reasonable minds could differ as to the conclusion to be drawn from the evidence. Id.; see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (stating that under equivalent Rule 56 and Rule 50 standards, judgment as a matter of law is only appropriate "if, under the governing law, there can be but one reasonable conclusion as to the verdict").
 
 
 39
 The governing law under which we assess the evidence here is settled and undisputed. The First and Fourteenth Amendments protect state and local government employees such as Miller and Sales from discharge or other significant adverse employment actions taken because of their political affiliations, see Rutan v. Republican Party of Ill., 497 U.S. 62, 79, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990); Elrod v. Burns, 427 U.S. 347, 360, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), unless their public employer "can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved," Branti v. Finkel, 445 U.S. 507, 518, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980), or can prove that even if the action was motivated in part by political considerations, it would have been taken in any event for reasons unrelated to political affiliation. See O'Hare Truck Service, Inc. v. City of Northlake, 518 U.S. 712, 725, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996) (applying "mixed-motive" principles of Mt. Healthy City Bd. of Ed. v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977) to patronage termination of service provider's contract with municipality). And, within these general principles, it has been established in this circuit that these substantive protections extend to the Virginia office of assistant registrar and to decisions not to reap point holders of that office. See McConnell v. Adams, 829 F.2d 1319 (4th Cir.1987).
 
 
 40
 In seeking to vindicate these rights by their action under § 1983, Miller and Sales had the burden to prove that Mason or Grant, or both, acting "under color of state[law]" had "subject[ed], or cause[d] [them] to be subjected to the deprivation of" those rights. 42 U.S.C. § 1983. Critically for this case, the § 1983 causation language, "subject[ ] or cause[ ] to be subjected," imposes liability not only for conduct that directly violates a right but for conduct that is the effective cause of another's direct infliction of the constitutional injury. As the First Circuit has put it:
 
 
 41
 The requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury.
 
 
 42
 Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553, 560-61 (1st Cir.1989) (Bownes, J.) (citations omitted).
 
 
 43
 This principle of effective causation by indirect means, grounded in the literal language of § 1983 and in general tort law, see Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961) (holding that § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his action"), overruled on other grounds, Monell v. Department of Social Servs. of City of New York, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), has been widely recognized and applied in § 1983 litigation. See, e.g., Malley v. Briggs, 475 U.S. 335, 345 n. 7, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (holding that misleading warrant application by § 1983 defendant could be effective cause of ensuing false arrest on judicially-issued warrant); Jones v. City of Chicago, 856 F.2d 985 (7th Cir.1988) (holding that misleading statements by § 1983 defendants to prosecutor could be effective cause of ensuing prosecution); Slakan v. Porter, 737 F.2d 368, 372 (4th Cir.1984) (holding that deliberate indifference of prison officials could properly be found effective cause of subordinates' infliction of constitutional injury); see also Spell v. McDaniel, 824 F.2d 1380, 1387-88, 1390 (4th Cir.1987) (applying general principle to impose municipal liability for policy found to be effective cause of constitutional injury inflicted by employee). This general principle indisputably applies as well to the § 1983 patronage action here at issue.
 
 
 44
 In assessing the sufficiency of the evidence under these governing substantive principles, it is important to identify the legal-factual theories upon which the case was tried, hence the specific issue raised by the Rule 50(a) motion.
 
 
 45
 As earlier indicated, Miller's and Sales's theory, as pleaded and presented at trial, was that though Read's was the official decision not to reappoint, the effective cause of the decision was the politically-motivated conduct of Mason and Grant which effectively ordained Read's decision. Mason's and Grant's countering defense, as pleaded and presented at trial, was simply a flat denial: their actions had not been the effective cause of the challenged non-reappointment decisions; those decisions had been properly and independently made by Read in exercise of her legal powers of office.
 
 
 46
 The issue for us is therefore a narrow one: whether the evidence was sufficient to support a rational jury finding that Mason and Grant, or either of them, for politically-motivated reasons,[7] effectively caused Miller and Sales not to be reappointed. The district court ruled that the evidence was not sufficient to support the requisite finding of causation linking Mason and Grant to the non-reappointments, and on that narrow basis granted the Rule 50(a) motion. We disagree.
 
 
 47
 We are satisfied, assessing the evidence de novo, that it sufficed under governing § 1983 causation principles to permit a jury rationally to find that Mason and Grant effectively caused the decision not to reappoint Miller and Sales. Certainly we do not think it possible to say that when assessed in the light most favorable to Miller and Sales, "the only conclusion a reasonable jury could draw from the evidence," was that Mason and Grant did not effectively cause that decision. And, that is the ultimate test we apply. See Winant, 5 F.3d at 774.
 
 
 48
 We believe that little more is needed to explain our conclusion than to refer to our recitation in Part I of the evidence as there deliberately stated in the light most favorable to Miller and Sales. Miller and Sales properly have emphasized certain of this evidence and inferences reasonably to be drawn from it as most critically supporting their position. We summarize.
 
 
 49
 From the outset of the Registrar selection process conducted by the Electoral Board, Mason and Grant (once he was appointed), had sought, successfully in the end, to use that process as a means for insuring the appointment of new Assistant Registrars as well, despite the fact that this was not within the Board's prerogative. Grant had, in fact, actively solicited Dori Harvey, the eventual appointee as Assistant Registrar, to apply for the Registrar position.
 
 
 50
 Once on the Board, Grant, who had talked with Mason about the matter, took a direct step to use the Registrar selection process for that purpose. Acting on his own so far as the record shows, he drafted and directed the Personnel Department to send the Electoral Board a memorandum identifying two of the nine recommended finalists for the Registrar position, one being Dori Harvey, as "best ... suited in the Assistant Registrar position." This did not reflect any actual evaluation by the Department, which had not been charged with evaluating Assistant Registrar candidates, and was done only because directed by Grant.
 
 
 51
 In the course of notifying Read that she had been appointed Registrar, Mason brought up the subject of how she should deal with the Assistant Registrar positions. Until that time, Read had not known that she selected them, and had therefore given the subject no thought. Mason elaborated by suggesting three options: do without any; reappoint Miller and Sales; or "take the recommendations the Personnel Department had given the Board." As to the option of reappointing Miller and Sales, Mason suggested there could be several problems arising from their continued loyalty to Arnold, including correspondence with and leaking of information to her about Read's conduct of the office, "that type of thing." As to the option of taking the Personnel Department's recommendation, Mason advised Read of the memorandum drafted by Grant that had identified Harvey and Nuckles as "suited" for that position. Read knew neither of them; indeed at the time she "didn't know much of what was going on."
 
 
 52
 That very night, by Mason's and Grant's arrangement, Read met with them, Dori Harvey, and Harvey's father at the Piedmont Club for cocktails. This was the first time Read had ever met or talked with Harvey. The next day, Harvey accompanied Read to the Registrar's office and was there introduced as Read's assistant during the transition period. At that time, Read had requested no personal references for Harvey nor reviewed Harvey's application for the Registrar position.
 
 
 53
 Later that same day, Mason delivered to Arnold a copy of the purported minutes of the previous day's Board meeting which stated that "Mason had been directed to notify Linda Arnold and her two assistants that they would not be reappointed...." Mason also then directed Arnold to tell Miller and Sales that, per the minutes, they would not be reappointed, and Arnold did so. When later confronted with the fact that the Board had no authority in the reappointment of Assistant Registrars, Mason took the awkward position that the statement was inaccurate, that the Board had not discussed the Assistant Registrars' reappointment. He then had the minutes amended to reflect what he now said was the fact at odds with that earlier reported.
 
 
 54
 Sometime during this period, either Mason or Grant notified Read that Nuckles had withdrawn from consideration for an Assistant Registrar position, whereupon, according to Read, she assumed that "that left Ms. Harvey. I had no choice." Nuckles had not, in fact, withdrawn.
 
 
 55
 Two days after first meeting Harvey, still without having sought any personal references or read her application or any evaluation (if such there was) by the Personnel Department, Read officially appointed Harvey as her sole Assistant Registrar, the Board having decided in the interval that there should be only one.
 
 
 56
 We agree with Miller and Sales that a jury rationally could infer from this and related contextual evidence that though Mason and Grant did not themselves make the decision not to reappoint, their endeavors were, as intended, its effective cause. More specifically, that their endeavors had the intended effect of foreclosing for Read any choice but to replace Miller and Sales with Dori Harvey. And, that this was accomplished by taking advantage of Read's deliberately encouraged dependence upon them in a new and unfamiliar and fastmoving situation to convince her that she had but one choice, a choice bolstered by a bogus official recommendation that they had contrived.
 
 
 57
 Against the weight of this evidence and its inferential force on the causation issue, Mason and Grant mainly seek to support the district court's ruling by pointing to conflicting evidence on critical matters. Grant denied contriving a bogus recommendation for Harvey. Read recanted her earlier testimony that she was confronted with but one option--to select Harvey--and that in making her choice she relied heavily on Mason and Grant; in later testimony she asserted her complete independence in choosing among a number of options, including the reappointment of Miller and Sales. Mason explained away as simple inadvertence the misrepresentations in the Board minutes that he used to inform Miller and Sales of their non-reappointment. It is elementary, however, that these conflicting versions have no relevance to the Rule 50(a) ruling, despite Mason's and Grant's rather surprising reliance upon them as the linchpin of their argument.
 
 
 58
 The crux of the causation issue here is, of course, whether Read did indeed act as an independent agent in deciding to appoint Harvey and not to reappoint Miller and Sales, or whether though she made the official decision, it was effectively made for her by Mason and Grant. In ruling dispositively for Mason and Grant on the causation issue, the district court seems to have relied almost entirely upon Read's credibility in asserting her independence. But that, of course, the court could not properly do in ruling on this Rule 50(a) motion in the face of the considerable evidence favorable to Miller and Sales, including Read's own inconsistent prior testimony, drawing that independence in doubt--certainly in genuine issue--as a practical matter.[8] Cf., e.g., Mason v. Oklahoma Turnpike Authority, 115 F.3d 1442, 1451 (10th Cir.1997) ("The jury may have found it peculiar that [a managing director] would hire as his assistant a person he barely knew and had never interviewed"). The conflicting evidence favoring Miller and Sales, not being implausible on its face, should have been given precedence in ruling on the motion.[9]
 
 
 59
 As earlier noted, supra note 7, despite reservations as to whether the issue has been properly raised and preserved for review, we have concluded to address the sufficiency of the evidence to permit a finding that Mason's and Grant's challenged conduct was politically motivated.
 
 
 60
 Miller's and Sales's burden was to offer sufficient evidence to permit a finding that that conduct was substantially motivated by political considerations. See O'Hare Truck Service, 518 U.S. at 725, 116 S.Ct. 2353. Those considerations might relate either to the targeted person's affiliation with one political party or lack of affiliation with or support of another party. See Rutan, 497 U.S. at 64, 110 S.Ct. 2729; Elrod, 427 U.S. at 359-60, 96 S.Ct. 2673.
 
 
 61
 The evidence here clearly sufficed to support, though surely not to compel, a finding that Mason's and Grant's conduct, which we earlier have concluded could be found the effective cause of the challenged non-reappointments, was also politically motivated. Again, we summarize.
 
 
 62
 In the immediate aftermath of the Republican gubernatorial victory, Mason, then the lone Republican on the Electoral Board, met with other local Republican office-holders to discuss, among other things, candidates for the Registrar position, now that "George Allen has won and we get to occupy the Registrar's office."
 
 
 63
 Following up, Mason contacted the Bath County Registrar to discuss, among other matters, the Registrar position in the City of Lynchburg, noting that though Arnold, the Democrat incumbent, was doing a good job, he wanted somehow to replace her.
 
 
 64
 Later, still during Arnold's incumbency, Mason met with several Republican office-holders to discuss ways not to reappoint Arnold without violating the law.
 
 
 65
 During the application process for the Registrar position, Grant solicited Dori Harvey's application through her father, Chip Harvey, whom Grant knew to be a participant in Republican fundraising and other events. At the time, Mason did not know Dori Harvey, but knew her mother was a Republican and presumed her father to be. When Harvey's application was filed, it was supported by Flo Traywick, a prominent Lynchburg Republican.
 
 
 66
 Mason and Grant knew at this time that Arnold, the incumbent Registrar, had been appointed by a Democrat-majority Electoral Board and that Arnold had appointed both Miller and Sales. And they also knew that the local Republican Committee Chairman had accused Arnold and her office of conducting the office in a politically partisan manner.
 
 
 67
 Finally, there is the undisputed fact that all three members of the Registrar's office, being either known or assumed by Mason and Grant to be associated with or beholden to the Democratic Party, were replaced at the first opportunity that arose after Mason and Grant came to be the required Republican majority on the Electoral Board.
 
 
 68
 We are satisfied that from this evidence a jury reasonably could infer that Mason's and Grant's conduct respecting the Assistant Registrar positions was substantially, if not entirely, motivated by political considerations. Mason and Grant point out that there was no direct evidence that they sought to insure Harvey's appointment because of her Republican Party ties or to replace Miller and Sales because of any known or assumed Democratic Party affiliations. But, constitutional "patronage" law is clear that the requisite political motivation, as any state of mind, can be proved by circumstantial evidence as commonly the only kind available for this purpose. See, e.g., Anthony v. Sundlun, 952 F.2d 603, 605-06 (1st Cir.1991) (holding that proof of political motivation in patronage case not confined to "(relatively rare) instances in which a 'smoking gun' can be produced" and commenting that "circumstantial evidence alone can support a finding of political discrimination"); Cygnar v. City of Chicago, 865 F.2d 827, 844-45 (7th Cir.1989) (holding that evidence that patronage targets' names were known by defendant to be on Democratic Party contributors' list sufficient to support finding that defendant knew, despite his denial, of their political affiliations). The concededly circumstantial evidence here was clearly sufficient to support the required finding.
 
 B.
 
 69
 We next address Miller's and Sales's challenge to the district court's refusal to grant their motion in limine for an application of collateral estoppel based upon the jury verdict for Arnold in her earlier patronage action against Mason and Grant.[10] Specifically, they sought a ruling that in their action it was an established fact--with the jury to be so instructed--that Mason and Grant had caused Arnold's non-reappointment as Registrar for politically-motivated reasons.
 
 
 70
 This would have involved an offensive use of collateral estoppel which, though permissible in appropriate circumstances in federal courts, is committed, because of its particular possibilities for inequity, to "broad" trial court discretion. See Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 331, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). The district court exercised its discretion here by refusing to apply collateral estoppel, expressly relying on two factors: that Miller and Sales might have joined the earlier Arnold action, see id. (noting this as a factor militating against preclusion), and that the Arnold action had been settled, thereby avoiding appellate review.
 
 
 71
 These are relevant and significant factors properly taken into account by the district court in exercising the broad discretion committed to it in deciding whether to apply offensive collateral estoppel. We cannot therefore, declare its decision to refuse application here an abuse of discretion, and accordingly, affirm its ruling.
 
 C.
 
 72
 Finally, we consider Miller's and Sales's challenge to the trial judge's refusal to grant their pretrial motion under 28 U.S.C. § 455 (1993) that he recuse himself because of his demonstrated bias against their cause.
 
 
 73
 In support of their motion, Miller and Sales presented evidence of several alleged manifestations of bias on the judge's part. In a telephone conference with counsel for both sides on February 24, 1997, before any evidence on the merits had been presented, the judge volunteered that "they [referring to defendants] had every reason not to hire those ladies [referring to plaintiffs]." (J.A. at 33, 57.) Further, the judge indicated that because Arnold had threatened suit, Grant, Mason, and/or Read were justified in not reappointing Miller and Sales and that doing so was non-discriminatory. When informed by counsel that defendants did not appear to be pressing Arnold's threat of a lawsuit as their defense in this case, the court remarked "of course they won't say that, but it's human nature." (Id. at 36-37.)
 
 
 74
 During the hearing at which he denied the recusal motion, the judge expressed his dissatisfaction with the outcome of the Arnold litigation, commenting that he should not have sent the Arnold case to the jury and was surprised by the verdict because he did not believe there was any evidence to support it. (See id. at 63-68.) He also remarked that he "felt a little guilty" about suggesting that the parties in the Arnold case pursue a settlement. (Id. at 86.) During arguments on the Rule 50(a) motion, when counsel for Miller and Sales contended that the court should allow the evidence to go to the jury, the judge responded: "No, I made that mistake in[the Arnold] case and I'm not going to make it here today." (Id. at 1026-27.)
 
 
 75
 28 U.S.C. § 455(a) provides that "any justice, judge, or magistrate shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." Under this statute, "[t]he standard to be applied is an objective one, to foster not only actual impartiality but also the appearance of impartiality." United States v. Carmichael, 726 F.2d 158, 160 (4th Cir.1984) (citations omitted). A trial judge's denial of a recusal motion is reviewed for abuse of discretion. See United States v. Gordon, 61 F.3d 263, 267 (4th Cir.1995).
 
 
 76
 In the principal Supreme Court decision interpreting § 455(a), the Court emphasized that disqualifying bias or partiality must normally arise from events, proceedings, or experiences outside the courtroom. See Liteky v. United States, 510 U.S. 540, 555, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994). Opinions formed during judicial proceedings can, however, under limited circumstances require recusal. As the Liteky court put it:
 
 
 77
 Opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deepseated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.
 
 
 78
 Id.
 
 
 79
 Because we have determined that a new trial must be ordered on other grounds, we believe it unnecessary to determine whether the district court also committed reversible error by declining to recuse under § 455. Our declination to determine that issue is without prejudice to the right of Miller and Sales if so disposed, to raise it again on the remand we order. If raised then, it must be assessed in the different context that results from this appeal and its result.
 
 
 80
 AFFIRMED IN PART; REVERSED AND REMANDED FOR NEW TRIAL.
 
 
 
 [1]
 Because the principal issue on appeal is the sufficiency of the evidence to survive a motion challenging it, we recite the facts on the basis of undisputed evidence or as viewed in the light most favorable to Miller and Sales, sometimes noting specific conflicts in testimony on particularly critical issues
 
 
 [2]
 When Arnold was initially appointed, and until this court's decision in McConnell v. Adams, 829 F.2d 1319 (4th Cir.1987), it apparently was accepted bipartisan practice to select registrars based on partisan political considerations
 
 
 [3]
 In countering trial testimony, Grant denied Chambers's version, asserting that he never gave Chambers any draft memorandum and that Chambers was lying. (Id. at 902-03.)
 
 
 [4]
 In conflict with this version of Nuckles's conduct, Nuckles testified that she never withdrew her name from consideration. (Id. at 812-13.)
 
 
 [5]
 Testifying at trial of this action, Read changed her version of these events. At trial she asserted that she did have a choice and that neither Grant nor Mason caused her not to reappoint Miller or Sales. (Id. at 991, 1004.) She further asserted that, at the time, she believed she had about six different options how to proceed and that she did not feel any compulsion in making her decision. (Id. at 465, 991, 998.)
 
 
 [6]
 Mason and Grant were named in their individual and official capacities. Petty and (presumably, though not nominally) Read were sued only in their official capacities. No point has been raised about the amenability of the Board to suit. The theory upon which the claim was tried, as advanced by Miller and Sales and as understood by the court and opposing parties, was that Mason and Grant were the active agents in causing Miller and Sales not to be reappointed. It was on this basis that they alone were sued in their individual, as well as official, capacities. The other named defendants, Petty, Read, and the Board itself, were only sought to be held liable in their official capacities on the claim for injunctive relief of reinstatement were Mason and Grant found to have caused a violation of the asserted constitutional right
 
 
 [7]
 Although in their brief Mason and Grant dance vaguely around the sufficiency of the evidence of their political motivation, it is doubtful that they have properly raised and preserved that issue as an alternative basis for affirming the judgment. The reason for the ambivalence is obvious. Under their consistently maintained position that they did not directly or indirectly cause the non-reappointments, the motivation for whatever they may have done in the matter was factually and legally irrelevant. They say exactly that at one point in their brief: "Whether Grant and Mason considered plaintiffs to be part of Arnold's democratic administration is irrelevant. Read made the appointment, not Grant or Mason." (Appellees' Br. at 21.) Consistent with this theory, they did not base their final, oral Rule 50(a) motion on a lack of proof of their political motivation, and the district court's ruling, consistent with that position and with the court's obvious view of the case, addressed only Read's motivation: "There is no evidence that Mrs. Read knew anything about the political affiliation of either of the plaintiffs." (J.A. at 1029.)
 We might therefore properly decline to consider as an alternative ground for affirmance the insufficiency of evidence of their political motivation and confine review to the narrow issue whether there was sufficient evidence that they caused the non-reappointments. See 9A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure §§ 2533, 2536 (2d ed.1995).
 In view of the ambiguity of the record on this point, and the obvious relevance of the issue on any re-trial, see id. at § 3536 (noting law of the case implications), we will assume, for purposes of the case, that it is properly before us and will address it in following text.
 
 
 [8]
 Miller and Sales suggest that the district court's ruling is flawed not only in its raw evidence assessment but by a legal misapprehension of the controlling causation rule. Specifically, they say the court erroneously thought the standard was "undue influence" by Mason and Grant, which would require--borrowing from the term's use in other contexts--proof of some form of "coercion" or "fraud." The district court did use the term in opining that Mason and Grant had not used "undue influence" in affecting Read's judgment. If this did reflect a belief that the requisite § 1983 causation could only be found on that basis, we agree that this was an erroneous view. Here, however, we need not attempt to divine whether the district court actually applied a more stringent causation standard than was proper for, in our judgment, his critical assessment was erroneous under the proper standard
 
 
 [9]
 Tangentially, in the Statement of Facts section of their brief (see Appellees' Br. at 2, 3), Mason and Grant say that Miller and Sales "never sought appointment to new four-year terms from ... Read ... never took any action, made any request or comment about wanting to be appointed, etc." This assertion--made as one of Fact--is not formally made the basis of any legal argument against causation proof in the Argument section of their brief, except as it may be inferred from a cryptic comment made in an Argument sub-section concerning political motivation where it is said that "Sales and Miller never asked Read to consider them to be her assistants." (Id. at 28.)
 Again, as in the case of the political motivation issue, see supra note 7, this was not made a basis for their oral Rule 50(a) motion, nor was it a basis for the district court's ruling on that motion. Consequently, we are also doubtful that it should be considered properly raised and preserved for review under the applicable rules. If it were, it would be without merit. In the first place, the assertion in the Argument section of the brief is immediately followed by the negating recognition that "Nonetheless, Read understood that appointing either or both as assistants was an option for her. She ... chose not to appoint either of them." (Appellees' Br. at 28.)
 Beyond that concession, the law is against any suggestion that a failure to make formal application under the circumstances of this case would per se preclude proof of a patronage claim. See Brett v. Jefferson County, 123 F.3d 1429, 1433 n. 9 (11th Cir.1997) (so holding). Where, as here, the evidence would support a finding that before they had had any opportunity to make formal application, they had been officially advised that they would not be reappointed, it would support a finding that they need not have taken that futile step in order to preserve a viable claim. Cf. Pinchback v. Armistead Homes Corp., 907 F.2d 1447, 1451 (4th Cir.1990) (holding in commercial employment case that application is unnecessary where it reasonably appears futile).
 
 
 [10]
 Although we remand for a new trial on other grounds, we address this issue because of its possible relevance in further proceedings