**UNPUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

PROJECT LIFE, INCORPORATED,
          *Plaintiff-Appellee,*

UNITED STATES OF AMERICA,
          *Intervenor,*

          and

ANGELA MARIE ADAMS, on behalf of
herself and others similarly situated;
VANESSA TRUDY BARLOW, on behalf
of herself and others similarly
situated; BARBARA NEVETTE
WILLIAMS, on behalf of herself and
others similarly situated,

          *Plaintiffs,*

          v.

PARRIS N. GLENDENING, Governor of
the State of Maryland; MARYLAND
DEPARTMENT OF TRANSPORTATION
(MDOT); MARYLAND PORT
ADMINISTRATION; PORT LAND USE
DEVELOPMENT ZONE ADVISORY
COUNCIL; JOHN PORCARI, Secretary of
Transportation; JAMES J. WHITE,
Executive Director of the Maryland
Port Administration,

          *Defendants-Appellants,*

          and

No. 01-1754

DAVID L. WINSTEAD, Secretary of
Transportation; TAY YOSHITANI;
ALCOHOL AND DRUG ABUSE
ADMINISTRATION, an agency of the
Maryland Department of Health and
Mental Hygiene,

*Defendants.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William M. Nickerson, Senior District Judge.
(CA-98-2163-WMN)

Argued: June 5, 2002

Decided: September 4, 2002

Before WILKINS, TRAXLER, and KING, Circuit Judges.

Affirmed by unpublished per curiam opinion.

**COUNSEL**

**ARGUED:** Kathleen A. Morse, Assistant Attorney General, Balti-
more, Maryland, for Appellants. Betty Jo Christian, STEPTOE &
JOHNSON, L.L.P., Washington, D.C., for Appellee. **ON BRIEF:** J.
Joseph Curran, Jr., Attorney General of Maryland, M. Catherine Orle-
man, Assistant Attorney General, Baltimore, Maryland, for Appel-
lants. Martin D. Schneiderman, Bruce C. Bishop, Julie M. Jackson,
STEPTOE & JOHNSON, L.L.P., Washington, D.C., for Appellee.
Ralph F. Boyd, Jr., Assistant Attorney General, Jessica Dunsay Sil-
ver, Seth M. Galanter, Kevin Russell, Appellate Section, Civil Rights
Division, UNITED STATES DEPARTMENT OF JUSTICE, Wash-
ington, D.C., for Intervenor.

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Appellee Project Life, Incorporated, brought this action against the Maryland Port Administration and various other defendants (collectively, "the MPA"). Project Life alleged that the MPA violated Part A of Title II of the Americans with Disabilities Act (ADA) of 1990, 42 U.S.C.A. §§ 12131-12134 (West 1995), by refusing to provide Project Life with a long-term lease for a berth at a pier controlled by the MPA. The MPA now appeals orders of the district court denying the MPA's motion for judgment as a matter of law and granting Project Life's request for injunctive relief. For the reasons set forth below, we affirm.

I.

In 1993, Project Life acquired the Sanctuary, a former naval hospital ship. The Sanctuary was not then, and is not now, seaworthy, and Project Life has no plans to make it so. Rather, Project Life plans to operate a drug rehabilitation clinic for women on board the Sanctuary while the vessel is berthed at a pier. Ultimately, Project Life hopes to provide rehabilitation services, including life skills and job training, for up to 300 women at a time, for rotations of 30 to 90 days. During their rehabilitation, residents would not be permitted to leave the ship, and only staff members would be allowed to have access to the ship. Project Life anticipates that approximately 300 employees, working in three shifts, would be needed to provide services to the residents. These workers would come and go from the ship as their shifts began and ended.

In order to obtain funding for its operations, Project Life needed to be able to assure potential benefactors of the stability and longevity of the program. In practical terms, potential donors required assurances that Project Life had a long-term berth for the ship. A long-term

berth (of at least five years) was deemed necessary so that money spent on improvements, such as the extension of sewer and electrical lines, would not be wasted. Project Life also required that the ship be permanently moored to a pier.[1]

Several years ago, Project Life approached the MPA about a long-term lay berth for the Sanctuary at a pier controlled by the MPA. The MPA is responsible for administering several shipping terminals in the Port of Baltimore;[2] its statutory mission is to increase waterborne commerce, *i.e.*, the loading and unloading of cargo, at state ports, *see* Md. Code Ann., Transp. § 6-102(c)(1) (2001). One of the terminals administered by the MPA is North Locust Point, which consists of ten current and former piers. For the most part, the MPA leases berth space at North Locust Point on a temporary basis (a day or two at a time) as ships come into the port to unload or load cargo. There are, however, several exceptions to this general rule. Most notably, the MPA has entered a five-year renewable lease with the Navy for "lay berths" (*i.e.*, non-cargo related berths) for ships that are part of the United States Navy Ready Reserve.

Discussions between Project Life and the MPA eventually came to focus on Pier 6 at North Locust Point. Pier 6 has not been used to support cargo operations for approximately 20 years, and the MPA has no plans to refurbish the pier to make it usable. Nevertheless, after initially assuring Project Life that its needs could be met, the MPA delayed making a binding commitment, apparently in response to pressure from two state legislators whose districts encompassed North Locust Point and the surrounding residential community.[3] Among

---

[1] The use of the term "permanently" is something of a misnomer in this context. Ordinarily, ships are moored to piers by lines that may be cast off in a matter of minutes, without the use of special tools. In contrast, a permanently moored ship is attached in such a way that unmooring takes several hours and may require the use of special tools.

[2] Additional terminals are owned by the City of Baltimore and various private entities.

[3] Project Life presented evidence of several attempts by the legislators to scuttle the rehabilitation program. For example, one of the legislators introduced legislation transferring responsibility for finding a berth from the MPA to the Maryland Alcohol and Drug Abuse Administration; the other threatened to lead protest marches against the Governor, who supported Project Life.

other things, the MPA required Project Life to obtain the support of the surrounding community as a condition of obtaining a lease for the Sanctuary at any MPA-controlled pier. Such a requirement had never been imposed on any other potential tenant at North Locust Point.

Having failed to reach agreement with the MPA, Project Life filed this action asserting that the MPA's failure to provide a long-term lease for a berth at Pier 6 constituted a denial of "the benefits of the services, programs, or activities of a public entity," 42 U.S.C.A. § 12132, in violation of the ADA. A jury found in favor of Project Life and awarded $12 in nominal damages. The district court subsequently conducted its own examination of the record, reached the same factual conclusions as the jury, and entered an injunction ordering the MPA to negotiate a long-term lease for Pier 6. At that time, the district court also denied the MPA's motion for judgment as a matter of law.[4] We review this ruling de novo. *See Konkel v. Bob Evans Farms Inc.*, 165 F.3d 275, 279 (4th Cir. 1999).

## II.

Title II of the ADA prohibits discrimination against a "qualified individual with a disability" by a public entity with respect to the provision of services, programs, or activities. 42 U.S.C.A. § 12132. As is relevant here, the ADA defines a "qualified individual with a disability" as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for the receipt of services . . . provided by a public entity." *Id.* § 12131(2). In order to establish a violation of Title II, a plaintiff must demonstrate (1) disability; (2) qualification (with or without modification) for the service in question; and (3) denial of the service "due to discrimination solely on the basis of the disability." *Baird v. Rose*, 192 F.3d 462, 467 (4th Cir. 1999).

---

[4]On appeal, Project Life released its claim for damages, making it unnecessary for us to consider the MPA's assertion of Eleventh Amendment immunity. We reject the MPA's contention that Project Life's release of the damages award voids the finding of liability by the jury.

The MPA first argues that Project Life is not "qualified" because it seeks a service the MPA does not provide, namely, a long-term lay berth for a ship to be used for residential purposes. The evidence at trial, however, clearly established that the MPA does provide long-term lay berths—*i.e.*, those leased to the Navy—on terms nearly identical to those sought by Project Life. The MPA argues that the leases to the Navy are not relevant because naval personnel do not live on those ships full-time; thus, the MPA maintains that any entity seeking a berth for a residential ship is not qualified as a matter of law. We reject this argument. At trial, the parties presented conflicting evidence regarding the genuineness of the MPA's "nonresidential" qualification, and the question of whether Project Life was qualified to receive services from the MPA was submitted to the jury. Because there was sufficient evidence from which a reasonable jury could conclude that the "nonresidential" qualification was not bona fide, we must affirm the denial of the motion for judgment as a matter of law. *See Sales v. Grant*, 158 F.3d 768, 775 (4th Cir. 1998); *cf. Coupe v. Fed. Express Corp.*, 121 F.3d 1022, 1026 (6th Cir. 1997) (noting that question of whether occupational qualification is bona fide is one of fact).[5]

Next, the MPA argues that Project Life is not entitled to the protection of the ADA because an integral part of the rehabilitation program is the isolation of residents from the surrounding community. According to the MPA, Project Life's program thus violates a central purpose of the ADA, which is to promote the integration of disabled individuals into society, *see* 42 U.S.C.A. § 12101(a)(2), (8) (West 1995). This argument fails for two reasons. First, the MPA mistakes the means of Project Life's program for its ends. The ultimate goal of the rehabilitation program is the successful reintroduction of former drug addicts into productive society; the isolation of those individuals from potentially destructive influences is a temporary measure designed to

---

[5]The MPA also argues that any modifications to its services in order to accommodate Project Life were not reasonable and that providing the lease requested by Project Life would fundamentally alter the nature of the services provided by the MPA. *See* 28 C.F.R. § 35.130(b)(7) (2001). The evidence at trial demonstrated, however, that no modifications to the MPA's services were required to accommodate the disabilities of Project Life's clients.

ensure that the ultimate goal is attained. Second, the MPA seeks to turn an underlying purpose of the ADA into an element of the claim. However, no authority supports such a holding. We therefore reject this contention.

## III.

For the reasons set forth above, we conclude that the district court properly denied the MPA's motion for judgment as a matter of law.[6] Accordingly, we affirm.

*AFFIRMED*

---

[6]The MPA does not appear to raise a separate challenge to the grant of injunctive relief. To the extent any such challenge is made, we conclude that the district court did not abuse its discretion. *See Tuttle v. Arlington County Sch. Bd.*, 195 F.3d 698, 703 (4th Cir. 1999) (per curiam).

Project Life also asserted that the MPA's refusal to negotiate a lease violated the Fair Housing Act (FHA), 42 U.S.C.A. §§ 3601-3631 (West 1994 & Supp. 2002), and the district court concluded that injunctive relief was warranted under that statute, as well. Because we affirm the award of injunctive relief under the ADA, we do not address issues related to the award of relief under the FHA.