Affirmed in part, reversed in part, and remanded by published opinion. Chief Judge TRAXLER wrote the opinion, in which Judge THACKER joined. Judge HOLLANDER wrote a separate opinion concurring in part and dissenting in part.
TRAXLER, Chief Judge:
Six plaintiffs appeal a district court order granting summary judgment against them in their action against B.J. Roberts in his individual capacity and in his official capacity as the Sheriff of the City of Hampton, Virginia. The suit alleges that Roberts retaliated against the plaintiffs in violation of their First Amendment rights by choosing not to reappoint them because of their support of his electoral opponent. We affirm in part, reverse in part, and remand for trial.
*372 I.
Viewing the facts in the light most favorable to the plaintiffs, as we must in reviewing an order granting summary-judgment against them, the record reveals the following. Bobby Bland, Daniel Ray Carter, Jr., David W. Dixon, Robert W. McCoy, John C. Sandhofer, and Debra H. Woodward (“the Plaintiffs”) are all former employees of the Hampton Sheriffs Office (“the Sheriffs Office”).
Roberts was up for re-election in November 2009, having served as sheriff for the prior 17 years. Jim Adams announced in early 2009 that he would run against Sheriff Roberts. Adams had worked in the Sheriffs Office for 16 years and had become the third most senior officer, with a rank of lieutenant colonel, when he resigned in January 2009 to run.
The Hampton City Police Department has primary responsibility for law enforcement in Hampton. However, the Sheriffs Office maintains all city correctional facilities, secures the city’s courts, and serves civil and criminal warrants. In December 2009, the Sheriffs Office had 190 appointees, including 128 full-time sworn deputy sheriffs, 31 full-time civilians, 3 unassigned active duty military, and 28 part-time employees. Carter, McCoy, Dixon, and San-dhofer were sworn, uniformed sheriffs deputies who worked as jailers in the Sheriffs Office Corrections Division.[1] They had not taken the Virginia Department of Criminal Justice Services’ “Basic Law Enforcement” course, completion of which was required in Virginia for an officer to patrol and have immediate arrest powers.[2] However, they did take the “Basic Jailer and Court Services” course, which has about half as long a curriculum as the Basic Law Enforcement course. Although they did not have general powers of immediate arrest, the deputies did have the authority to make “incidental arrest[s] in [the] range of [their] work.” J.A. 297.
Bland and Woodward were not deputies, but rather worked in non-sworn administrative positions. Woodward was a training coordinator and Bland was a finance and accounts payable officer.
Notwithstanding laws and regulations prohibiting the use of state equipment or resources for political activities, see Hatch Act, 5 U.S.C. § 1501, et. seq.; 22 Va. Admin. Code § 40-675-210 (2012), Sheriff Roberts used his office and the resources that he controlled, including his employees’ manpower, to further his own re-election efforts. His senior staff often recruited Sheriffs Office employees to assist in these efforts. For example, he used his employees to work at his annual barbeque/golf tournament political fundraiser, and his subordinates pressured employees to sell and buy tickets to his fundraising events.
The Sheriff won reelection in November 2009. He subsequently reappointed 147 of his 159 full-time employees. Those not reappointed included the six Plaintiffs as well as five other deputies and one other civilian.
On March 4, 2011, the Plaintiffs filed suit in federal district court against Sheriff Roberts in his individual and official capacities under 42 U.S.C. § 1983. All six Plaintiffs alleged that the Sheriff violated their First Amendment right to free association when he refused to reappoint them *373 based on their lack of political allegiance to him in the 2009 election. Additionally, Carter, McCoy, Dixon, and Woodward alleged that the Sheriff violated their First Amendment right to free speech when he refused to reappoint them because of various instances of speech they made in support of Adams’s campaign. Among the remedies Plaintiffs requested were compensation for lost back pay and compensation for lost front pay or, alternatively, reinstatement. The Sheriff answered Plaintiffs’ complaint and asserted several affirmative defenses.
Roberts subsequently moved for summary judgment, and the district court granted it. See Bland v. Roberts, 857 F.Supp.2d 599 (E.D.Va.2012). Regarding the free-speech claims, the district court concluded that Carter, McCoy, and Woodward had all failed to allege that they engaged in expressive speech and that Dixon had not shown that his alleged speech was on a matter of public concern. See id. at 603-06. Regarding the association claims, the court concluded that Plaintiffs failed to establish any causal relationship between their support of Adams’s campaign and their non-reappointment. See id. at 606-07. Finally, assuming ar-guendo that the Sheriff did violate Plaintiffs’ First Amendment rights, the district court concluded he was entitled to qualified immunity on the individual-capacity claims and Eleventh Amendment immunity on the official-capacity claims. See id. at 608-10.
II.
On appeal, the Plaintiffs maintain that the district court erred in granting summary judgment against them.
This court reviews de novo a district court’s order granting summary judgment, applying the same standards as the district court. See Providence Square Assocs., L.L.C. v. G.D.F., Inc., 211 F.3d 846, 850 (4th Cir.2000). Summary judgment is appropriate “if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(a).
The Plaintiffs allege that they were retaliated against for exercising their First Amendment rights to free speech and association. The First Amendment, in relevant part, provides that “Congress shall make no law ... abridging the freedom of speech.” U.S. Const, amend. I. The Fourteenth Amendment makes this prohibition applicable to the states. See Fisher v. King, 232 F.3d 391, 396 (4th Cir.2000). Not only does the First Amendment protect freedom of speech, it also protects “the right to be free from retaliation by a public official for the exercise of that right.” Suarez Gorp. Indus, v. McGraw, 202 F.3d 676, 685 (4th Cir.2000). Although government employees do not forfeit their constitutional rights at work, it is well established “that the government may impose certain restraints on its employees’ speech and take action against them that would be unconstitutional if applied to the general public.” Adams v. Trustees of the Univ. of N.C.-Wilmington, 640 F.3d 550, 560 (4th Cir.2011) (internal quotation marks omitted).
The Supreme Court in Connick v. Myers, 461 U.S. 138, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983), and Pickering v. Board of Education, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), has explained how the rights of public employees to speak as private citizens must be balanced against the interest of the government in ensuring its efficient operation. In light of these competing interests, we have held that in order for a public employee to prove that an adverse employment action violated his First Amendment rights to freedom of speech, he must establish (1) *374 that he “was speaking as a citizen upon a matter of public concern” rather than “as an employee about a matter of personal interest”; (2) that “the employee’s interest in speaking upon the matter of public concern outweighed the government’s interest in providing effective and efficient services to the public”; and (3) that “the employee’s speech was a substantial factor in the employee’s termination decision.” McVey v. Stacy, 157 F.3d 271, 277-78 (4th Cir. 1998).[3] In conducting the balancing test in the second prong, we must consider the context in which the speech was made, including the employee’s role and the extent to which the speech impairs the efficiency of the workplace. See Rankin v. McPherson, 483 U.S. 378, 388-91, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).
Factors relevant to this inquiry include whether a public employee’s speech (1) impaired the maintenance of discipline by supervisors; (2) impaired harmony among coworkers; (3) damaged close personal relationships; (4) impeded the performance of the public employee’s duties; (5) interfered with the operation of the [agency]; (6) undermined the mission of the [agency]; (7) was communicated to the public or to coworkers in private; (8) conflicted with the responsibilities of the employee within the [agency]; and (9) abused the authority and public accountability that the employee’s role entailed.
Ridpath v. Board of Governors Marshall Univ., 447 F.3d 292, 317 (4th Cir.2006). Accordingly, “a public employee who has a confidential, policymaking, or public contact role and speaks out in a manner that interferes with or undermines the operation of the agency, its mission, or its public confidence, enjoys substantially less First Amendment protection than does a lower level employee.” McVey, 157 F.3d at 278.
“This principle tends to merge with the established jurisprudence governing the discharge of public employees because of their political beliefs and affiliation.” Id. Such claims must be analyzed under the principles established by Elrod v. Bums, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), and Branti v. Finkel, 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980). See Fields v. Prater, 566 F.3d 381, 385-86 (4th Cir.2009). These cases make clear that the First Amendment generally bars the firing of public employees “solely for the reason that they were not affiliated with a particular political party or candidate,” Knight v. Vernon, 214 F.3d 544, 548 (4th Cir.2000) (internal quotation marks omitted), as such firings can impose restraints “on freedoms of belief and association,” Elrod, 427 U.S. at 355, 96 S.Ct. 2673 (plurality opinion); see Smith v. Frye, 488 F.3d 263, 268 (4th Cir.2007).[4] Still, the Supreme Court in Elrod created a narrow exception “to give effect to the democratic process” by allowing patronage dismissals of those public employees occupying policymaking positions. Jenkins v. Medford, 119 F.3d 1156, 1161 (4th Cir.1997) (en banc). This exception served “the important government goal of assuring ‘the implementation of policies of [a] new adminis *375 tration, policies presumably sanctioned by the electorate.’ ” Id. (quoting Elrod, 427 U.S. at 367, 96 S.Ct. 2673). In Branti, the Supreme Court modified the Elrod test somewhat to “reeognize[] that the labels used in Elrod ignored the practical realities of job duty and structure.” Id. Under the test as modified, “the ultimate inquiry is not whether the label ‘policymaker’ or ‘confidential’ fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation [or political allegiance] is an appropriate requirement for the effective performance of the public office involved.” Branti, 445 U.S. at 518, 100 S.Ct. 1287.
In Stott v. Haworth, 916 F.2d 134 (4th Cir.1990), we adopted a two-part test for conducting this analysis. See Fields, 566 F.3d at 386. First, we consider whether “the [plaintiffs] position involve[s] government decisionmaking on issues where there is room for political disagreement on goals or their implementation.” Stott, 916 F.2d at 141 (internal quotation marks omitted). If it does, we then “examine the particular responsibilities of the position to determine whether it resembles a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation [or political allegiance] is an equally appropriate requirement.” Id. at 142 (internal quotation marks omitted). The first step of the inquiry requires us to examine the issues dealt with by the employee “at a very high level of generality,” while “[t]he second step requires a much more concrete analysis of the specific position at issue.” Fields, 566 F.3d at 386. At the second step, “courts focus on the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office.” Stott, 916 F.2d at 142. In this regard, we focus on the job description for the position in question and “only look past the job description where the plaintiff demonstrates some systematic unreliability, such as where the description has been manipulated in some manner by officials looking to expand their political power.” Nader v. Blair, 549 F.3d 953, 961 (4th Cir.2008) (internal quotation marks omitted).[5]
Our causation analysis for the association claims is the same as for the speech claims. The plaintiff bears the initial burden of proving that his exercise of his First Amendment rights “was a ‘substantial’ or ‘motivating’ factor in the employer’s decision to terminate him.” Wagner v. Wheeler, 13 F.3d 86, 90 (4th Cir.1993); Sales v. Grant, 158 F.3d 768, 775-76 (4th Cir.1998). And if the plaintiff satisfies that burden, the defendant will avoid liability if he can demonstrate, by a preponderance of the evidence, that he would have made the same employment decision absent the protected expression. See Sales, 158 F.3d at 776 (citing O’Hare Truck Serv., Inc. v. City of Northlake, 518 U.S. 712, 725, 116 S.Ct. 2353, 135 L.Ed.2d 874 (1996)).
Plaintiffs challenge the district court’s rulings with regard to the merits of both their association and their speech claims as well as with regard to qualified and Eleventh Amendment Immunity. We begin our analysis with the merits of Plaintiffs’ association claims and will then address the merits of the speech claims before *376 turning to Eleventh Amendment and qualified immunity.
A. Merits of Association Claims
We conclude that Carter, McCoy, and Dixon at least created genuine factual disputes regarding whether the Sheriff violated their association rights, but that San-dhofer, Woodward, and Bland did not.
1. Elrod-Branti
With regard to these claims, we start by asking whether the Sheriff had the right to choose not to reappoint the Plaintiffs for political reasons. Certainly there is legitimate disagreement over the goals and implementation of the goals of a sheriffs office; accordingly, the outcome of the Stott test will turn on the outcome in Stott’s second step. See, e.g., Knight, 214 F.3d at 548-51. Thus, it is that part of the test on which we focus our attention.
Carter, McCoy, and Dixon all occupied the same position in the Sheriffs Office.[6] They were uniformed jailers and they held the title of sheriffs deputy. Because they held that title, much of the debate between the parties concerning the application of the Elrod-Bmnti test to these three men relates to our decision in Jenkins. In Jenkins we analyzed the First Amendment claims of several North Carolina sheriffs deputies who alleged that the sheriff fired them for failing to support his election bid and for supporting other candidates. In so doing, we considered the political role of a sheriff, the specific duties performed by sheriffs deputies, and the relationship between a sheriff and his deputies as it affects the execution of the sheriffs policies. See Jenkins, 119 F.3d at 1162-64. We generally concluded that deputies “play a special role in implementing the sheriffs policies and goals,” that “[t]he sheriff is likely to include at least some deputies in his core group of advis-ors,” that deputies “exercisfe] significant discretion in performing their jobs” when they are on patrol, that “[t]he sheriff relies on his deputies to foster public confidence in law enforcement,” that he expects them to provide him with the “truthful and accurate information” the sheriff needs, and that sometimes deputies serve as the sheriffs general agents whose acts can expose the sheriff to civil liability. See id. at 1162-63. We therefore concluded “that in North Carolina, the office of deputy sheriff is that of a policymaker, and that deputy sheriffs are the alter ego of the sheriff generally, for whose conduct he is liable.” Id. at 1164. On that basis, we determined “that such North Carolina deputy sheriffs may be lawfully terminated for political reasons under the Elrod-Branti exception to prohibited political terminations.” Id.; see also id. (“We hold that newly elected or reelected sheriffs may dismiss deputies either because of party affiliation or campaign activity.”). We reasoned that “[b]e-cause they campaigned for [the sheriffs] opponents, the deputies in the instant case had no constitutional right to continued employment after the election, and so have failed to state a claim under 42 U.S.C. § 1983.” Id.
Had Jenkins’s analysis ended there, our Elrod-Bmnti review of Carter’s, McCoy’s, and Dixon’s claims would be quite straightforward. But Jenkins’s analysis did not end there. Several judges dissented from the majority’s decision, and the resulting opinions included an exchange of particular relevance here. The dissent maintained that “the majority broadly holds that all deputy sheriffs in North Carolina — regard *377 less of their actual duties — are policymak-ing officials.” Id. at 1166 (Motz, J., dissenting). The dissent contended that had a proper Elrod-Branti review been conducted, focusing on “analysis of the particular duties of each deputy,” the result of the case would have been different. Id.
For its part, the majority flatly rejected the dissent’s claim that the decision was not based on the duties of the deputies before the court. The majority stated:
We limit dismissals based on today’s holding to those deputies actually sworn to engage in law enforcement activities on behalf of the sheriff. We issue this limitation to caution sheriffs that courts examine the job duties of the position, and not merely the title, of those dismissed.[FN66:] Because the deputies in the instant case were law enforcement officers, they are not protected by this limitation.[FN67]
Id. at 1165 (majority opinion). Responding to the conclusion that the deputies’ law enforcement duties made their political loyalty to the sheriff an appropriate requirement for the effective performance of the deputies’ jobs, the dissent emphasized that the only relevant allegations in the plaintiffs’ complaint were that the deputies’ “job requirements consisted of performing ministerial law enforcement duties for which political affiliation is not an appropriate requirement” and that none of the plaintiffs “occupied a policymaking or confidential position.” Id. at 1166 (Motz, J., dissenting) (internal quotation marks omitted).
That brings us to the question of how to read Jenkins. Despite a significant amount of language in the opinion seemingly indicating that all North Carolina deputies could be terminated for political reasons regardless of the specific duties of the particular deputy in question, and despite the dissent’s allegation that the majority indeed held that all North Carolina deputies may be fired for political reasons, the majority explicitly stated that it analyzed the duties of the plaintiffs and not merely those of deputies generally. See id. at 1165 (majority opinion). In the end, the majority explained that it was the deputies’ role as sworn law enforcement officers that was dispositive and suggests that the result might have been different had the deputies’ duties consisted of working as dispatchers. See id. at 1165 & nn. 66-67. Accordingly, to be true to Jenkins, we too must consider whether requiring political loyalty was an appropriate requirement for the effective performance of the public employment of the deputies before us in light of the duties of their particular positions.
According to their formal job description, the deputies’ duties and responsibilities were to “[pjrovide protection of jail personnel and the public,” “[p]rovide safekeeping and welfare of prisoners,” “[p]rotect[ ] ... society by preventing] ... escapes,” “[c]onduct security rounds,” “[supervise inmate activities,” “[p]rovide cleaning supplies to inmates to clean their cells,” “[p]ass out razors on appropriate days,” “[e]scort inmates throughout the jail as required,” “[m]aintain floor log of daily inmate activities,” “[e]nsure inmates are [fed],” “[r]un recreation and visitation as scheduled or authorized,” “[a]nswer inmate correspondences and grievances,” and “[s]upervise laundry detail.” J.A. 602. None of the men had leadership responsibilities, nor were they confidants of the Sheriff.
*378 These duties are essentially identical to those of the plaintiff in Knight v. Vernon. In that case, we considered whether the district court erred in granting summary judgment against a sheriffs office employee on her First Amendment political firing claim on the basis that the employee could be lawfully terminated for political reasons. See Knight, 214 F.3d at 548. Unlike Carter, McCoy, and Dixon, Knight did not have the title of sheriffs deputy, but Knight worked for a North Carolina sheriffs department, as a low-level jailer. See id. at 549, 550. Noting that “[t]he central message of Jenkins is that the specific duties of the public employee’s position govern whether political allegiance to her employer is an appropriate job requirement,” see id. at 549, we closely examined the duties of Knight’s job in applying the Elrod-Branti analysis at the summary judgment stage:
As a jailer Ms. Knight was responsible for the processing, supervision and care, and transportation of inmates. Ms. Knight’s processing duties included fingerprinting new inmates, obtaining their personal data (addresses, next of kin, etc.), marking and storing their personal belongings, routing them for physical examinations, and arranging for their initial baths and changes into clean clothing. Ms. Knight’s daily supervision and care duties involved monitoring inmates every half hour, distributing and logging their medications and supplies, serving them food, and managing their visitors. Occasionally, Ms. Knight filled in as a cook when help was short in the jail’s kitchen. Finally, Ms. Knight assisted in transporting inmates to prisons and medical facilities.
Id. at 546. In holding that Jenkins did not allow the sheriff to terminate Knight for political reasons, we contrasted Knight’s duties with those of the deputy sheriffs in Jenkins. We noted that “a deputy is a sworn law enforcement officer [and thus] has the general power of arrest, a power that may be exercised in North Carolina only by an officer who receives extensive training in the enforcement of criminal law.” Id. at 550. We also noted that “[a] sworn deputy is the sheriffs alter ego: he has powers conterminous with his principal, the elected sheriff.” Id. (internal quotation marks omitted). In contrast, we explained that the jailer’s authority “is much more circumscribed” and “[h]er training, which is much more limited than that of a deputy, is concentrated on matters of custodial care and supervision.” Id. We noted that “exercising the power of arrest is not one of the job duties of a jailer,” and Knight “was not out in the county engaging in law enforcement activities on behalf of the sheriff,” and she was not “a confidant of the sheriff.” Id. We further noted that she neither “advise[d] him on policy matters” nor was “involved in communicating the sheriffs policies or positions to the public.” Id. Although we recognized that the job of jailer involves the exercise of some discretion, we concluded that “a jailer does not exercise the ‘significant discretion’ ” that the North Carolina deputies generally exercise. Id. at 551. Rather, because she “worked mostly at the jail performing ministerial duties,” she was “not entrusted with broad discretion,” and “[t]he sheriff did not rely on her for assistance in implementing his law enforcement platform.” Id. at 550. We therefore determined that the sheriff had not established as a matter of law that political loyalty was an appropriate requirement for Knight’s performance of her job as a jailer.
We conclude that the near identity between the duties of the deputy plaintiffs in this case and Knight’s duties warrants the same result here. Although Sheriff Roberts points to various differences between Knight and the plaintiffs here that he claims make this case more like Jenkins *379 and less like Knight, we conclude that none of them is sufficiently significant to justify a different outcome.
First, although the Sheriff correctly points out that Carter, McCoy, and Dixon were all sworn deputies, the oath that they took was simply to support the federal and Virginia constitutions and faithfully and impartially discharge their duties to the best of then* ability. See Va.Code Ann. § 49-1; Thore v. Chesterfield Cnty. Bd. of Supervisors, 10 Va.App. 327, 391 S.E.2d 882, 883 (1990). No one contends that these men took a law enforcement officer’s oath, as the Jenkins plaintiffs did. See N.C. Gen.Stat. § 11-11. In any event, in Knight we specifically rejected the argument that the result in Knight would have been different even had Knight taken a law enforcement officer’s oath, noting that it is the specific duties of the public employees that must be the focus of the Elrod-Branti inquiry. See Knight, 214 F.3d at 551. Because Knight’s duties were “essentially custodial” and she, unlike the deputies in Jenkins, was not empowered to stand in for the sheriff on a broad front, we held that she could not be required to be politically loyal to the sheriff. Id.
Sheriff Roberts notes that the deputies in the present case, like those in Jenkins, were entitled to stand in for their sheriff in one way that Knight could not, namely, by making an arrest. It is true that in Virginia sheriffs deputies are, like sheriffs, statutorily authorized to make arrests under a wide range of circumstances. See Va.Code Ann. § 19.2~81(A)(2). That all deputies have been granted general arrest powers by statute, however, does not mean that exercising those powers was an appreciable part of the duties of their particular positions. In fact, Carter, McCoy, and Dixon were trained as jailers, and it is undisputed that they did not take the “Basic Law Enforcement” course that the Virginia Department of Criminal Justice Services requires officers to take before they may exercise the statutorily granted general arrest power. And, while the evidence in the record was that the deputies were authorized to make arrests for offenses occurring before them in the course of their “everyday responsibilities,” J.A. 297, the Plaintiffs offered evidence that their technical authorization to make arrests had no appreciable effect whatsoever on the job duties of their position. According to the declarations of Carter, McCoy, and Dixon, not only had none of them ever made an arrest, but they were not even aware they had the authority to do so. In fact, Adams stated in his declaration that in his 16 years at the Hampton Sheriffs Office, during which he rose to the level of third most senior officer, he could not recall a sheriffs deputy making a single arrest. Thus, at this stage of the litigation, the Sheriff has not established that the jailers’ arrest duties were sufficiently significant that they would affect whether their political allegiance to the Sheriff was an appropriate requirement for the effective performance of their jobs.
The Sheriff also notes that Carter, McCoy, and Dixon each sought and received approval to perform “ ‘Extra Duty Employment’ comprising security work outside of the Sheriffs Office during which they were in uniform and armed.” J.A. 84. It is hard to see how this fact could significantly impact our Elrod-Branti analysis at this stage, however, considering that the record is silent concerning what duties the plaintiff deputies had concerning this “extra” work. Moreover, the Sheriff did not make any showing that such apparently optional work “outside of the Sheriffs Office,” J.A. 84, was part of “the specific duties of the public employee[s’] position.” Knight, 214 F.3d at 549.
In sum, we hold that at this stage of the litigation, the Sheriff has not demonstrated *380 that the duties of Carter, McCoy, and Dixon differed from Knight’s duties in any significant way, and we conclude that Sheriff Roberts has not shown that their duties resembled those of “a policymaker, a privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation [or political allegiance] is an equally appropriate requirement.” Stott, 916 F.2d at 142. Accordingly, he also has not demonstrated that political allegiance was an appropriate requirement for the jailers’ performance of their jobs. Accord DiRuzza v. County of Tehama, 206 F.3d 1304,1310-11 (9th Cir.2000) (holding that sheriff did not establish application of Elrodr-Branti exception as a matter of law in the case of a California deputy sheriff who worked as a jailer). Thus, we hold that the Sheriff was not entitled to summary judgment on the basis that he could terminate Carter, McCoy, and Dixon for their lack of political allegiance to him.
2. Causation
We now turn to the issue of whether the Plaintiffs’ lack of political allegiance to the Sheriff was a substantial basis for the Sheriffs decision not to reappoint them. See Wagner, 13 F.3d at 90. For reasons that we will explain, we conclude that Carter, McCoy, and Dixon have all at least created a genuine factual dispute regarding whether lack of political allegiance was a substantial basis for their non-reappointment, but that Sandhofer, Woodward, and Bland have not.

Carter and McCoy

In the late summer of 2009, Carter and McCoy visited Adams’s campaign Face-book page and made statements on the page indicating their support for his campaign. Specifically, Carter “liked” the page and “wrote and posted a message of encouragement” that he signed. J.A. 570. McCoy also “posted an entry on the page indicating [his] support for [Adams’s] campaign.” J.A. 586.[7] Carter’s and McCoy’s Facebook actions became well-known in the Sheriffs Office as many were shocked because “they appeared not to be supporting the sheriff.” J.A. 681.[8] Colonel Bowden, who was the second most senior officer in the Sheriffs Office, learned of Carter’s and McCoy’s presence on Adams’s Facebook Page and informed Sheriff Roberts.
In the late summer of 2009, Carter and Ramona Jones[9] — also a Hampton sheriffs deputy — co-hosted a cookout (“the August cookout”) attended by many Sheriffs Office employees, including Adams. The next day at work, Jones was approached by her supervisor, Lieutenant Crystal Cooke, who told Jones that she had heard that Adams had attended her cookout. Jones truthfully told Cooke that Carter had invited Adams. Shortly thereafter, then-Captain Kenneth Richardson approached Jones and asked her who had attended. She told him that Adams had been there, and Richardson “state[d] that the event had the appearance of a campaign event and said specifically that ‘it does not look good.’ ” J.A. 702. Jones told *381 Richardson, as she had told Cooke, that it was Carter who had invited Adams, and Richardson responded that Jones “needed to explain that to the Sheriff.” J.A. 702. Indeed, the Sheriff learned about the cookout and that Adams had attended. Pictures showing Sandhofer and McCoy at the event were posted on Facebook by early October.
In early September, Sheriff Roberts addressed his employees’ support for Adams in speeches he gave during the various shift changes. He expressed his disapproval with the decision of some to support Adams’s candidacy on Facebook. He stated that he would be sheriff for as long as he wanted and thus that his train was the “long train.” J.A. 572 (internal quotation marks omitted). He indicated that Adams’s train was the “short train” and that those who openly supported Adams would lose their jobs. J.A. 572(internal quotation marks omitted). Additionally, after the conclusion of the meeting that occurred before Carter’s shift change, the Sheriff angrily approached Carter and “ma[de] several intimidating statements.” J.A. 572. He then added, “You made your bed, and now you’re going to lie in it— after the election, you’re gone.” J.A. 572 (internal quotation marks omitted).
The Sheriff represented that his heated exchange with Carter after one of Roberts’s “long train” speeches pertained to Carter’s objections about disciplinary proceedings concerning Carter’s wife rather than to Carter’s support of Adams.[10] Indeed, the Sheriff testified that that conversation was the reason that he chose not to reappoint Carter. Carter flatly denied that Roberts made any reference to Carter’s wife during that conversation, however.[11]
If a jury credited Carter’s account of their heated exchange, however, it could reasonably conclude that Roberts was not telling the truth in an attempt to cover up his illegal retaliation. See Reeves v. Sand-erson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S.Ct. 2097,147 L.Ed.2d 105 (2000) (explaining that “[pjroof that the defendant’s explanation is unworthy of credence is ... one form of circumstantial evidence that is probative of intentional discrimination, and it may be quite persuasive”). The Sheriff, after all, had specifically warned his employees not to support Adams through Facebook and had told Carter that his support for Adams would cost him his job. For these reasons, we conclude that a reasonable jury could find that Carter’s lack of political allegiance to the Sheriff was a substantial motivation for the Sheriffs decision not to reappoint him.
Based on the evidence of Roberts’s strong animus toward those of his employees who supported Adams, a reasonable jury could also conclude that Roberts’s knowledge of McCoy’s support for Adams would have strongly motivated Roberts not to reappoint McCoy. Roberts claimed his primary reason for not reappointing McCoy was that McCoy had had “heated arguments with deputies when he was in *382 civil” and that Roberts “switched him up and brought him back to corrections.” J.A. 102. McCoy, however, stated that he had worked in the Sheriffs Office for more than 21 years and always received “above average” or “outstanding” evaluations, and that at no time prior to his non-reappointment did his immediate supervisor or second-level supervisor indicate that they had any problems with his performance. In light of the Sheriffs threat that supporters of Adams would lose their jobs and his specific statement of disapproval of employees being on Adams’s Facebook page, we conclude that a reasonable jury could conclude that McCoy’s lack of political allegiance to Roberts was a substantial motivation for the Sheriffs decision not to reappoint him.

Dixon

Plaintiffs presented evidence that Dixon performed his job “in an exemplary manner” during his more than 13 years with the Sheriffs Office, always earning performance evaluations of at least “above average” and earning a rating of “outstanding” in his last evaluation. At no time did his first-or second-level supervisor express concerns with his performance.
Dixon voiced his opposition to Sheriff Roberts’s candidacy on Election Day to Frances Pope, who was working the polls for Roberts’s campaign. On Dixon’s way out, referring to the Sheriffs campaign material, he told Pope that she should “just throw that stuff away” (“the polling-place comment”). J.A. 581 (internal quotation marks omitted). Dixon spoke in a friendly, nonconfrontational tone and did not use any expletives. Dixon also had an Adams bumper sticker on his car that he was “pretty sure people saw.” J.A. 148.
The Sheriff denies that Dixon was not reappointed because of his lack of political allegiance. Rather, the Sheriff represents that Dixon in fact was let go because he used profanity in making the polling-place comment, although the Sheriff does not indicate the source of his belief and admits that he never sought Dixon’s side of the story before replacing him.[12] See Appel-lee’s brief at 10; J.A. 99 (stating that “[I]t was [the Sheriffs] understanding” that Dixon said, ‘You can take this f — ing s — , stuff, and throw it in the trash can.”). For his part, Dixon denies using any profanity in making the polling-place comment. We conclude that if a jury credited Dixon’s testimony, it could also reasonably find that the Sheriff knew Dixon had not used profanity and that his support for Adams, as revealed by the polling-place comment and bumper sticker, substantially motivated him not to reappoint Dixon. See Reeves, 530 U.S. at 147,120 S.Ct. 2097.

Sandhofer

In contrast, we conclude that Plaintiffs have failed to create a genuine factual dispute regarding whether Sandhofer’s political disloyalty to Sheriff Roberts was a substantial basis for his non-reappointment. The Sheriff had used Sandhofer — ■ who had experience working for a downtown marketing organization — for significant marketing efforts and fundraising in 2008. As a result, Colonel Bowden asked Sandhofer in 2009 to obtain prominent sign locations among downtown Hampton businesses in conjunction with the 2009 election. Sandhofer agreed to help the Sheriff in this way, even though he actually never followed through. Sandhofer also was ordered by Lieutenant Miranda Harding to work the polls on Election Day, but he *383 declined on the basis that his “family comes first.” J.A. 169. Additionally, he verbally expressed his support for Adams to several people, as discreetly as possible, and he attended the August cookout and was depicted in pictures of the cookout posted on Facebook. Plaintiffs further point out that Sandhofer’s girlfriend drove him to work and to campaign debates in her car, which had an Adams bumper sticker affixed to it. Sergeant John Meyers “mentioned” the sticker to Sandhofer on at least one occasion. J.A. 591.
We conclude that this evidence is simply too thin to create a genuine factual dispute regarding whether Sandhofer’s lack of political allegiance to the Sheriff was a substantial basis for his non-reappointment. Sandhofer admitted attending a reception for the Sheriffs campaign at the mayor’s house at the Sheriffs request. And, he admitted agreeing to help the Sheriff locate signs for the 2009 election, although he never actually located any of the signs. Furthermore, while he refused to work the polls on Election Day, the reason he gave had nothing to do with supporting Adams. Without more, there simply is not sufficient evidence that the Sheriff identified Sandhofer as an Adams supporter, even assuming that the Sheriff believed his girlfriend was supporting Adams. And there was no reasonable basis for a jury to conclude that the Sheriff would have declined to reappoint Sandhofer based simply on his lack of affirmative assistance to the Sheriffs 2009 campaign. We therefore conclude that the district court properly granted summary judgment to the Sheriff on Sandhofer’s claim.

Woodward

We also conclude that Woodward did not create a genuine factual dispute concerning whether her lack of political allegiance to the Sheriff was a substantial basis for her non-reappointment.
During her more than 11 years with the Sheriffs Office, Woodward’s performance evaluations had always been “above average” or “outstanding.” J.A. 601 (internal quotation marks omitted). According to Woodward, “[i]t was very well known within the office that [she] was close to Jim Adams.” J.A. 600. In early 2009, Woodward’s former supervisor and mentor, Deborah Davis, became the treasurer of Adams’s campaign. Woodward also informed several of her coworkers that she supported Adams’s candidacy, although she generally tried to keep her support quiet to protect her job.
During Roberts’s prior campaigns, Woodward had worked “tirelessfly]” handing out flyers, working the polls, placing yard signs, attending campaign events, and selling and purchasing tickets. J.A. 599. In light of her support for Adams, however, she did none of those things in 2009, except for purchasing golf tournament tickets (because she felt coerced).
In the summer of 2009, Woodward noticed that her colleague, Lieutenant George Perkins, was circulating a petition to place the Sheriffs name on the ballot. Woodward complained to Sergeant Sharon Mays, Sergeant Meyers, Perkins himself, and others, on the basis that Perkins was not a Hampton resident and only Hampton residents could circulate such petitions. She also learned that another non-resident was circulating petitions and she had various conversations with Mays about that as well.
In the end, however, we conclude that it would be mere speculation for a jury to conclude that Woodward was let go because of lack of political allegiance to Roberts. Outside of her petition complaints, there is no significant evidence that would support an inference that the Sheriff believed Woodward was supporting Adams. Woodward conceded that she shared her *384 preference for Adams only with people she thought would keep her feelings secret. And Woodward maintained that the petition complaints were not based on the fact that Roberts was the subject of the petitions but on the principle that they should not be circulated in the workplace by a non-Hampton resident. There is no evidence that the Sheriff or others did not take her complaints at face value or otherwise assumed that her true goal was to work against Roberts’s campaign.
The Sheriff testified that the reason he did not reappoint Woodward and Bland was that he expected that the number of deputies he would be allocated by the Compensation Board would be reduced, based on the declining population of the Hampton City Jail. See Va.Code Ann. § 15.2-1609.1. Woodward and Bland counted against that allotment and the Sheriff maintains that he decided he needed to have deputies in Woodward’s and Bland’s positions. Although Woodward’s and the Sheriffs accounts are in conflict concerning whether he ever offered Woodward the opportunity to become a deputy, we conclude that that conflict is simply not a sufficient basis for a reasonable inference that her lack of political allegiance to Roberts was a substantial motivation for her non-reappointment.

Bland

Finally, we determine that Plaintiffs failed to create a genuine factual issue concerning whether a lack of political allegiance was a substantial basis for the Sheriffs decision not to reappoint Bland. Bland had a financial position in the Sheriffs Office Administration Division. He had worked with the Sheriffs Department for more than nine years, performed “in an exemplary manner,” and received performance evaluations of “above average.” Bland had declined to provide significant volunteer assistance to the Sheriffs 2009 campaign after having provided many types of support for the Sheriffs past campaigns. He was also known to be very close to Deborah Davis, who had left the Sheriffs Office in 2008 to become Adams’s campaign treasurer in early 2009.
However, Bland admitted purchasing raffle tickets for the Sheriffs fundraising golf tournament, and he also admitted helping to set up electronic equipment the night of the election. He further admitted that he did not actively support Adams’s campaign in any way and that Woodward was the only person he even told of his intention to vote for Adams.[13] Something more would be necessary in order to warrant a reasonable inference that Bland’s lack of political allegiance to Sheriff Roberts was a substantial basis for the Sheriffs decision not to reappoint him.
B. Merits of Free-Speech Claims
The Plaintiffs next argue that the district court erred in granting summary judgment against them on their speech claims. We conclude that Carter, McCoy, and Dixon at least created genuine factual disputes regarding whether the Sheriff violated their free-speech rights, but that Woodward did not.

Carter

The first question to be addressed with regard to the speech claims is whether the conduct that the employee maintains precipitated his non-reappointment constituted speech at all. Carter’s conduct consisted of his “liking” Adams’s campaign page on Facebook. The district court concluded that “merely ‘liking’ a Facebook page is insufficient speech to merit constitutional protection” and that the record did not sufficiently describe what statement *385 McCoy made. Bland, 857 F.Supp.2d at 603. To consider whether this conduct amounted to speech, we first must understand, as a factual matter, what it means to “like” a Facebook page.
“Facebook is an online social network where members develop personalized web profiles to interact and share information with other members.” Lane v. Facebook, Inc., 696 F.3d 811, 816 (9th Cir.2012). Members can share various types of information, including “news headlines, photographs, videos, personal stories, and activity updates.” Id. Daily more than 500 million Facebook members use the site and more than three billion “likes” and comments are posted. See Brief of Face-book, Inc. as Amicus Cvtriae, at 3.
Every Facebook user has a profile, which “typically includes, among other things, the User’s name; photos the User has placed on the website (including one photo that serves as the User’s profile photo); a brief biographical sketch; a list of individual Facebook Users with whom the User [interacts, known as ‘friends’]; and ... a list of Facebook ‘Pages’ the User has Liked.” Id. at 4 (footnote omitted). “[Businesses, organizations and brands,” can also use “Pages” for similar purposes. What is a Facebook Page?, Fa-cebook, http://www.facebook.com/help/ 281592001947683 (last visited Sept. 17, 2013).
When a user logs on to Facebook, his home page is the first thing that he typically sees. Included on a home page is a news feed, “which, for most Users, is the primary place where they see and interact with news and stories from and about their Friends and Pages they have connected with on Facebook.” Brief of Facebook, Inc. as Amicus Curiae, at 5; see What is Nevus Feed, Facebook, http://www. facebook.com/help/327131014036297 (last visited Sept. 17, 2013). It “is a constantly updating list of stories from people and Pages that [the User] follow[s] on Face-book.” What is News Feed?, Facebook, http://www.facebook.com/help/ 327131014036297 (last visited Sept. 17, 2013).
“Liking” on Facebook is a way for Face-book users to share information with each other. The “like” button, which is represented by a thumbs-up icon, and the word “like” appear next to different types of Facebook content. Liking something on Facebook “is an easy way to let someone know that you enjoy it.” What does it mean to “Like” something?, Facebook, http://www.facebook.com/help/ 452446998120360 (last visited Sept. 17, 2013). Liking a Facebook Page “means you are connecting to that Page. When you connect to a Page, it will appear in your timeline and you will appear on the Page as a person who likes that Page. The Page will also be able to post content into your News Feed.” What’s the difference between liking an item a friend posts and liking a Page?, Facebook, http://www.facebook. com/help/452446998120360 (last visited Sept. 17, 2013).
Here, Carter visited the Jim Adams’s campaign Facebook page (the “Campaign Page”), which was named “Jim Adams for Hampton Sheriff,” and he clicked the “like” button on the Campaign Page. When he did so, the Campaign Page’s name and a photo of Adams — which an Adams campaign representative had selected as the Page’s icon — were added to Carter’s profile, which all Facebook users could view. On Carter’s profile, the Campaign Page name served as a link to the Campaign Page. Carter’s clicking on the “like” button also caused an announcement that Carter liked the Campaign Page to appear in the news feeds of Carter’s friends. And it caused Carter’s name and his profile photo to be added to the Cam *386 paign Page’s “People [Who] Like This” list.
Once one understands the nature of what Carter did by liking the Campaign Page, it becomes apparent that his conduct qualifies as speech.[14] On the most basic level, clicking on the “like” button literally causes to be published the statement that the User “likes” something, which is itself a substantive statement. In the context of a political campaign’s Facebook page, the meaning that the user approves of the candidacy whose page is being liked is unmistakable. That a user may use a single mouse click to produce that message that he likes the page instead of typing the same message with several individual key strokes is of no constitutional significance.
Aside from the fact that liking the Campaign Page constituted pure speech, it also was symbolic expression. The distribution of the universally understood “thumbs up” symbol in association with Adams’s campaign page, like the actual text that liking the page produced, conveyed that Carter supported Adams’s candidacy. See Spence v. Washington, 418 U.S. 405, 410-11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam) (holding that person engaged in expressive conduct when there was “[a]n intent to convey a particularized message ..., and in the surrounding circumstances the likelihood was great that the message would be understood by those who viewed it”); see also Tobey v. Jones, 706 F.3d 379, 388 n. 3 (4th Cir.2013).
In sum, liking a political candidate’s campaign page communicates the user’s approval of the candidate and supports the campaign by associating the user with it. In this way, it is the Internet equivalent of displaying a political sign in one’s front yard, which the Supreme Court has held is substantive speech. See City of Ladue v. Gilleo, 512 U.S. 43, 54-56, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994). Just as Carter’s placing an “Adams for Sheriff’ sign in his front yard would have conveyed to those passing his home that he supported Adams’s campaign, Carter’s liking Adams’s Campaign Page conveyed that message to those viewing his profile or the Campaign Page.[15] In fact, it is hardly surprising that the record reflects that this is exactly how Carter’s action was understood. See J.A. 160 (McCoy’s testimony that in light of Carter’s liking Adams’s Campaign Page, “everybody was saying that ... Carter is out of there because he supported Adams openly”); see also J.A. 793 (Sheriffs Office employee stating that Roberts had said that “certain employees were on the Facebook page of his opponent, Jim Adams, indicating their support of Adams for Sheriff’).
*387 The second part of McVey’s first prong, concerning whether Carter was speaking as a private citizen on a matter of public concern, need not detain us long. The Sheriff does not dispute that Carter’s speech, if it was speech, was made in his capacity as a private citizen. Cf. Garcetti v. Ceballos, 547 U.S. 410, 421, 126 S.Ct. 1951,164 L.Ed.2d 689 (2006) (holding that employee does not speak as a private citizen when his speech is “pursuant to [his] official duties”). And, it is well established that an employee can speak as a private citizen in his workplace, even if the content of the speech is “related to the speaker’s job.” Id.; see Pickering, 391 U.S. at 564-65, 88 S.Ct. 1731 (holding that letter to local newspaper from teacher concerning school board policies was protected speech). Further, the idea expressed in Carter’s speech — that he supported Adams in the 2009 election — clearly related to a matter of public concern. See Citizens United v. Fed. Election Comm’n, 558 U.S. 310, 329, 130 S.Ct. 876, 175 L.Ed.2d 753 (2010) (describing political speech as “central to the meaning and purpose of the First Amendment”); McIntyre v. Ohio Elections Comm’n, 514 U.S. 334, 346, 115 S.Ct. 1511, 131 L.Ed.2d 426 (1995) (“Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order to assure the unfettered interchange of ideas for the bringing about of political and social changes desired by the people.” (internal quotation marks omitted)).
Next, on the record before us, Carter’s interest in expressing support for his favored candidate outweighed the Sheriffs interest in providing effective and efficient services to the public. Carter’s speech was political speech, which is entitled to the highest level of protection. See Meyer v. Grant, 486 U.S. 414, 422, 425, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988) (describing constitutional protection of “core political speech” as being “at its zenith” (internal quotation marks omitted)); see also Con-nick, 461 U.S. at 152, 103 S.Ct. 1684 (“We caution that a stronger showing [of disruption] may be necessary if the employee’s speech more substantially involved matters of public concern.”). Indeed, the public’s interest in Carter’s opinions regarding the election may have had particular value to the public in light of his status as a Sheriffs Office employee. See, e.g., Waters v. Churchill, 511 U.S. 661, 674, 114 S.Ct. 1878, 128 L.Edüd 686 (1994) (plurality opinion) (“Government employees are often in the best position to know what ails the agencies for which they work; public debate may gain much from their informed opinions.”). In contrast, despite the Sheriffs reference to the need for harmony and discipline in the Sheriffs Office, nothing in the record in this case indicates that Carter’s Facebook support of Adams’s campaign did anything in particular to disrupt the office or would have made it more difficult for Carter, the Sheriff, or others to perform their work efficiently. See Goldstein v. Chestnut Ridge Vohmteer Fire Co., 218 F.3d 337, 356 (4th Cir.2000) (holding that “generalized and unsubstantiated interests” “in maintaining morale and efficiency” within the fire department did not outweigh plaintiffs speech interest). The Sheriffs case in this regard is especially weak considering that he has failed to show that the jailers occupied any “confidential, policymaking, or public contact role” in the Sheriffs Office. McVey, 157 F.3d at 278.
Finally, for the same reasons that we hold that Carter has created a genuine factual issue regarding whether he was terminated because of his lack of political allegiance to the Sheriff, we conclude that *388 Carter has created a genuine factual issue concerning whether his Facebook support for Adams was also a substantial factor. The Sheriff warned Carter that his support of Adams would cost him his job, and a jury reasonably could take the Sheriff at his word.

McCoy

Our application of the McVey test to McCoy’s speech claim is very similar to our application of it to Carter’s. McCoy presented evidence that he engaged in First Amendment speech when he “went on Jim Adams’ campaign Facebook page and posted an entry on the page indicating [his] support for his campaign.” J.A. 586; see also J.A. 156 (stating that he “went on [Adams’s] Facebook page” and “posted [his] picture ... as a supporter”). Indeed, the evidence indicated that many in the Sheriffs Office were “shocked” by the posting because it indicated that McCoy was “not ... supporting the sheriff.” J.A. 681. The district court concluded that McCoy did not sufficiently allege that he engaged in speech because the record did not sufficiently describe what statement McCoy made. See Bland, 857 F.Supp.2d at 604.
Certainly a posting on a campaign’s Fa-cebook Page indicating support for the candidate constitutes speech within the meaning of the First Amendment.[16] For the same reasons as applied to Carter’s speech, McCoy’s speech was made in his capacity as a private citizen on a matter of public concern, namely, whether Adams should be elected Hampton Sheriff. That the record does not reflect the exact words McCoy used to express his support for Adams’s campaign is immaterial as there is no dispute in the record that that was the message that McCoy conveyed. Additionally, although many were shocked that McCoy would, so openly support Sheriff Roberts’s opponent, nothing in the record indicates that his speech created any sort of disruption or explains how the Sheriffs interest in operating the Sheriffs Office efficiently could outweigh McCoy’s interest in supporting the Sheriffs opponent in the election. See Goldstein, 218 F.3d at 356.
Further, for the same reasons that we conclude that a reasonable jury could find that McCoy’s political disloyalty was a substantial motivation for the Sheriffs decision not to reappoint him, such a jury could also find that McCoy’s (politically disloyal) speech was also a substantial motivation for his non-reappointment. With the Sheriff having specifically warned his employees not to support Adams through Facebook and having threatened that Adams supporters would not be reappointed, a jury could reasonably find that the Sheriff simply followed through with his threat by not reappointing McCoy.

Dixon

Dixon alleges he was not reappointed because he displayed an Adams bumper sticker on his car and because he made the polling-place comment. The district court concluded that there was no evidence that Roberts or other senior Sheriffs Office employees had knowledge of his bumper sticker and that the polling-place comment was merely a personal grievance rather *389 than a statement touching on a matter of public concern. See Bland, 857 F.Supp.2d at 605.
Although the evidence that the Sheriff or his senior officers knew of Dixon’s bumper sticker was thin, to say the least, the Sheriff admits that he terminated Dixon because of the polling-place comment. And, the statement that Pope should “just throw [her Roberts campaign materials] away” clearly constituted speech on a matter of public concern — the merits of Roberts’s campaign — made in Dixon’s capacity as a private citizen. See McIntyre, 514 U.S. at 346, 115 S.Ct. 1511; cf. Cohen v. California, 403 U.S. 15, 18, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971) (concluding that California “lack[ed] power to punish” the wearing of a jacket bearing the plainly visible words “F - -k the Draft” based on “the underlying ... evident position on the inutility or immorality of the draft”). Dixon represented that he made the statement in a nonconfrontational, friendly manner, and no specific evidence in the record indicated how his support for Adams might have created a lack of harmony in the Hampton Sheriffs Office.
As for causation, the Sheriff does not deny the fact that Dixon’s polling-place comment was the reason he was not reappointed. The Sheriff simply maintained that he believed Dixon used profanity in making the comment — although he does not explain the source of his belief. Were a jury to credit Dixon’s denial of that charge, it could reasonably conclude that what actually motivated the Sheriff not to reappoint Dixon was the fact that Dixon voiced his disapproval of the Sheriffs candidacy.

Woodward

Woodward’s alleged protected speech occurred when she complained about Lieutenant George Perkins’s circulation of a petition in support of Sheriff Roberts on the basis that Perkins was not a Hampton resident. As we have already explained, however, we conclude that it would be speculative for a jury to conclude that Woodward’s complaint regarding the petition was based on anything other than the reasons she voiced at the time, which were unrelated to the question of whether she supported Adams or Roberts in the election. We therefore conclude she has not created a genuine factual dispute regarding whether her complaint was a substantial motivation for her non-reappointment.
C. Eleventh Amendment Immunity
Plaintiffs next argue that the district court erred in ruling that Eleventh Amendment immunity would bar claims advanced against the Sheriff in his official capacity. We agree to the extent that the Plaintiffs seek the remedy of reinstatement.
The Eleventh Amendment to the United States Constitution provides: “The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.” Eleventh Amendment immunity protects unwilling states from suit in federal court. See Will v. Michigan Dep’t of State Police, 491 U.S. 58, 70-71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989); Edelman v. Jordan, 415 U.S. 651, 662-63, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974).[17] This immunity also protects *390 “state agents and state instrumentalities,” Regents of the JJniv. of Cal. v. Doe, 519 U.S. 425, 429, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997), meaning that it protects “arm[s] of the State” and State officials, Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). When a judgment against a governmental entity would have to be paid from the State’s treasury, the governmental entity is an arm of the State for Eleventh Amendment purposes. See Cash v. Granville Cnty. Bd. of Educ., 242 F.3d 219, 223 (4th Cir.2001). The Supreme Court, however, delineated an exception to the application of the Eleventh Amendment in Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). That exception “permits a federal court to issue prospective, injunctive relief against a state officer to prevent ongoing violations of federal law, on the rationale that such a suit is not a suit against the state for purposes of the Eleventh Amendment.” McBumey v. Cuccinelli, 616 F.3d 393, 399 (4th Cir.2010).[18] The operation of the Eleventh Amendment in this case thus depends on whether Sheriff Roberts is an arm of the State and, if so, whether the Ex parte Young exception applies.
The district court determined that Virginia sheriffs are constitutional officers, see Va. Const. Art. VII § 4; Va.Code Ann. § 15.2-1609; Jenkins v. Weatherholtz, 909 F.2d 105, 107 (4th Cir.1990), and that sheriffs are arms of the State, see Blankenship v. Warren Cnty., 918 F.Supp. 970, 973-74 (W.D.Va.1996). The district court also determined that “the State would be liable to pay adverse judgments won against the Sheriff in his official capacity.” Bland, 857 F.Supp.2d at 610. Thus, the court concluded, “a suit against the Sheriff in his official capacity is in fact a suit against the State.” Id. Finding no evidence of abrogation or waiver of immunity by the Commonwealth, the district court reasoned that “the Sheriff is immune from suit for claims against him in that capacity.” Id.
Plaintiffs do not dispute that the Commonwealth would be liable to pay any money judgment against the Sheriff. However, citing Edelman, 415 U.S. at 664-65, 94 S.Ct. 1347, Plaintiffs contend that Eleventh Amendment immunity does not apply to the claims against the Sheriff in his official capacity because Plaintiffs’ requests for reinstatement and lost pay are equitable claims to which the immunity does not apply.
Because reinstatement is a form of prospective relief, the refusal to provide that relief when it is requested can constitute an ongoing violation of federal law such that the Ex parte Young exception applies. See Coakley v. Welch, 877 F.2d 304, 307 (4th Cir.1989); State Emps. Bargaining Agent Coal. v. Rowland, 494 F.3d 71, 96 (2d Cir.2007). Plaintiffs are therefore correct that the Sheriff is not entitled to Eleventh Amendment immunity to the extent that they seek reinstatement. See Coakley, 877 F.2d at 307; State Emps. Bargaining Agent Coal., 494 F.3d at 96. As we have explained, however, to the extent that the claims seek monetary relief, they are claims against an arm of the *391 State. See Cash, 242 F.3d at 223. Thus, to the extent that the claims seek monetary relief against the Sheriff in his official capacity, the district court correctly ruled that the Sheriff is entitled to Eleventh Amendment immunity.
D. Qualified Immunity
The Sheriff argues that even if some of the Plaintiffs created genuine factual disputes concerning whether he violated their association or free-speeeh rights by not reappointing them, he is nevertheless entitled to qualified immunity to the extent that the claims are asserted against him in his individual capacity.
A government official who is sued in his individual capacity may invoke qualified immunity. See Ridpath, 447 F.3d at 306. “Qualified immunity protects government officials from civil damages in a § 1983 action insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.” Edivards v. City of Goldsboro, 178 F.3d 231, 250 (4th Cir.1999) (internal quotation marks omitted). In determining whether a defendant is entitled to qualified immunity, a court must decide (1) whether the defendant has violated a constitutional .right of the plaintiff and (2) whether that right was clearly established at the time of the alleged misconduct. See Walker v. Prince George’s Cnty., 575 F.3d 426, 429 (4th Cir.2009). However, “judges of the district courts and the courts of appeals [are] permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand.” Pearson v. Callahan, 555 U.S. 223, 236, 129 S.Ct. 808,172 L.Ed.2d 565 (2009).
In analyzing whether the defendant has violated a constitutional right of the plaintiff, the court should identify the right “at a high level of particularity.” Edwards, 178 F.3d at 251. For a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right “must be sufficiently clear that a reasonable official would understand that what he 'is doing violates that right.” Hope v. Pelzer, 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002) (internal quotation marks omitted).
We conclude that the Sheriff is entitled to qualified immunity concerning Carter’s, McCoy’s, and Dixon’s claims because in December 2009 a reasonable sheriff could have believed he had the right to choose not to reappoint his sworn deputies for political reasons, including speech indicating the deputies’ support for the Sheriffs political opponent.
Simply put, Jenkins sent very mixed signals. Although we conclude today for the reasons discussed earlier that Jenkins is best read as analyzing the duties of the particular deputies before the court, much of the opinion’s language seemed to indicate that a North Carolina sheriff could terminate his deputies for political reasons regardless of the duties of their particular positions. Truthfully, the Jenkins majority opinion reads almost like two separate opinions that are in tension with one another. All of the majority’s analysis up to the opinion’s final page concerns deputies generally or North Carolina deputies, and references particular duties of deputies, without indicating that the plaintiffs had those duties, see, e.g., 119 F.3d at 1162 (“The sheriff is likely to include at least some deputies in his core group of advis-ors. Deputies on patrol work autonomously, exercising significant discretion, in performing their jobs.” (footnote omitted)). This analysis leads up to the broad conclusion that “North Carolina deputy sheriffs may be lawfully terminated for political reasons under the Elrod-Branti exception *392 to prohibited political terminations.” Id. at 1164. The majority rejected our earlier decision in Jones v. Dodson, 727 F.2d 1329 (4th Cir.1984), where we concluded that no deputy could ever be a policymaker and held instead that “district courts are to engage in a Stott-type analysis, examining the specific position at issue, as we have done here today.” Jenkins, 119 F.3d at 1164. The majority later announced an even broader “h[o]ld[ing]” possibly not even limited to North Carolina sheriffs when it declared that “newly elected or reelected sheriffs may dismiss deputies either because of party affiliation or campaign activity.” Id.
As if this language were not already strong support for a broader reading of Jenkins, as we have pointed out, the dissent in Jenkins read it that way as well, accusing the majority of “holding] that all deputy sheriffs in North Carolina — regardless of their actual duties — are policy-making officials.” Id. at 1166 (Motz, J., dissenting); see also id. (“This all-encompassing holding is made without any inquiry into the actual job duties of the deputies before us.”); id. (“The majority ... engages in no analysis of the particular duties of each deputy.”); id. (“[T]he majority ... finds that all North Carolina deputy sheriffs are policymakers — without ever considering the positions held by each of the deputies at issue or their specific job duties.”).
• Additionally, Knight v. Vernon, while important to our decision regarding the merits of Carter’s, McCoy’s, and Dixon’s constitutional claims, did not clearly establish that the broader reading of Jenkins was incorrect. Although Knight worked in a sheriffs office, she was not a deputy. See Knight, 214 F.3d at 546. It is true that the Knight majority opined that Knight’s sheriff would not have had the right to fire her for political reasons even if she had taken the oath of a law enforcement officer (like the plaintiffs in Jenkins took and like the Knight dissent concluded Knight took). See id. at 551; id. at 555 (Widener, J., concurring and dissenting). But the Knight majority’s explanation for why it was immaterial whether Knight had taken the law enforcement officer oath could itself be reasonably taken as support for the broad reading of Jenkins. The Knight majority stated:
As we emphasized in Jenkins, we “examine the job duties of the position,” 119 F.3d at 1165, and Ms. Knight’s duties as a jailer were essentially custodial. She simply lacked the special status of a deputy sheriff, who is empowered to stand in for the sheriff on a broad front.
Id. at 551 (emphasis added). A sheriff reasonably reading Jenkins as painting all deputies with a broad brush could well have viewed Knight as doing the same, or, at the very least, not weighing in on the issue. See also id. at 550 (“The responsibilities of a jailer, such as Ms. Knight, are routine and limited in comparison to those of a deputy sheriff, who may be fired for his political affiliation.”); id. (“A jailer is not the sheriffs ‘second self in the sense that a deputy is.”).
The broader reading of Jenkins is also in line with a statement from another of our opinions, which was issued after Knight. In Pike v. Osborne, 301 F.3d 182 (4th Cir.2002), we held that, on a claim that a sheriff terminated a dispatcher for political affiliation reasons, the sheriff was entitled to qualified immunity because in December 1999 it was not clearly established that a sheriff in Virginia could not lawfully terminate, for political affiliation reasons, a dispatcher who was privy to confidential information. See Pike, 301 F.3d at 186 (Hamilton, J., concurring in the judgment); id. (Broadwater, J., concurring in the judgment) (adopting Judge Hamilton’s reasoning). Judge Hamilton *393 began his analysis in that case with the statement, “The law of this circuit is clear that sheriffs in Virginia have the right to lawfully terminate their deputies for political affiliation reasons.” Id. (citing Jenkins ). He then proceeded to explain why the law was nevertheless not clear regarding whether a dispatcher with access to confidential information, who was not a deputy, could be terminated for political affiliation reasons. See id.[19]
For the reasons we explained in reviewing the merits of the Elrod-Branti issue, we believe that this language, while consistent with the Jenkins dissent’s characterization of Jenkins’s, reasoning, is an overstatement in light of the Jenkins majority’s specific rejection of the dissent’s characterization of its analysis. Nevertheless, considering the conflicting signals that Jenkins and Pike sent, we conclude that a reasonable sheriff in December 2009 could have believed that he was authorized to terminate any of his deputies for political reasons.[20]
If we were deciding what the law was in December 2009 regarding the legality of a sheriff firing a deputy for political reasons, we would agree with our colleague in dissent that the law was that a sheriff could not fire for political reasons a deputy sheriff with the limited duties of a jailer. Where we believe we differ in our assessment of this case is in whether that law was clearly established and would have been so recognized not by a judge trained in the law, but by a reasonable sheriff.
For the reasons stated previously, we believe we have sent mixed signals as to when a sheriff could fire a deputy for political reasons and we have been unclear as to when he could and when he could not. Some parts of our en banc decision in Jenkins indicate he could do so and other parts would prohibit it. The dissent in Jenkins expressed its own confusion as to what the holding of Jenkins was and language in our cases since, as well as those from other courts, have interpreted the holding in Jenkins broadly and consistent with the Sheriffs. In short, we understand why a sheriff would not find the law in this situation clear, particularly given that he is a lay person.
We do not expect sheriffs to be judges and to have the training to sort through every intricacy of case law that is hardly a model of clarity. See Lawyer v. City of Council Bluffs, 361 F.3d 1099, 1108 (8th Cir.2004) (holding that defendants were entitled to qualified immunity because “[pjolice officers are not expected to parse code language as though they were participating in a law school seminar”); Lassiter v. Alabama A & M Univ. Bd. of Trustees, 28 F.3d 1146, 1152 n. 8 (11th Cir.1994) (“Even if some legal expert would have then concluded that a hearing was required, defendants would still be due qualified immunity if reasonable university officials would not have known about it.”), overruled on other grounds by Hope v. Pelzer, 536 U.S. 730, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002). Rather, in consider *394 ing whether constitutional rights were clearly established for qualified-immunity purposes, we view the issue from “the layman’s perspective,” Ross v. Reed, 719 F.2d 689, 696 n. 8 (4th Cir.1983), recognizing that “[particularly with regard to legal conclusions, lay officers obviously cannot be expected to perform at the level achievable by those trained in the law,” Kroll v. United States Capitol Police, 847 F.2d 899, 906 (D.C.Cir.1988) (Robinson, J., concurring in the judgment) (footnote omitted).
We note that in cases in which the Elrodr-Bmnti exception applies, and an employer therefore does not violate his employee’s association rights by terminating him for political disloyalty, the employer also does not violate his employee’s free speech rights by terminating him for speech displaying that political disloyalty.[21] See Jenkins, 119 F.3d at 1164 (holding that because pleadings established that Elrodr-Branti exception applied, deputies failed to state a First Amendment speech retaliation claim that deputies were dismissed for campaigning against the sheriff). Thus, a reasonable sheriff in December 2009 who believed that the Elrod-Branti exception applied to his deputies could have also reasonably believed that he could choose not to reappoint them for their speech indicating their political disloyalty to him. And Carter’s and McCoy’s Facebook activity and Dixon’s bumper sticker and polling-place comment certainly fall into that category. For this reason, we conclude that the Sheriff was entitled to qualified immunity concerning the claims of Carter, McCoy, and Dixon.[22]
E. Conclusion
In sum, as to the claims of Sandhofer, Woodward, and Bland, we conclude the district court properly analyzed the merits of the claims, and we therefore affirm the grant of summary judgment in favor of the Sheriff. As to the claims of Carter, McCoy, and Dixon, the district court erred by concluding that the Plaintiffs failed to create a genuine dispute of material fact regarding whether the Sheriff violated their First Amendment rights. Nevertheless, the district court properly ruled that the Sheriff was entitled to qualified immunity on Carter’s, McCoy’s, and Dixon’s claims seeking money damages against the Sheriff in his individual capacity, and that the Sheriff was entitled to Eleventh Amendment immunity against those claims to the extent they seek monetary relief against him in his official capacity. The Sheriff is not entitled to Eleventh Amendment immunity, however, on Carter’s, McCoy’s, and Dixon’s claims to the extent the remedy sought is reinstatement.
III.
Accordingly, for the foregoing reasons, we reverse the grant of summary judgment to the Sheriff regarding Carter’s, McCoy’s, and Dixon’s reinstatement claims, and we remand these claims to the district court for further proceedings. We *395 otherwise affirm the grant of summary judgment to the Sheriff.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

. Sandhofer worked as a jailer for most of his short time in the Sheriff's Office, although he worked as a civil process server in the Sheriff’s Office Civil Process Division for the final three months of his tenure.

. The Virginia Department of Criminal Justice Services, Division of Law Enforcement, has the responsibility of overseeing and managing training standards and regulations for the criminal justice community.

. The Sheriff appropriately does not contend that the fact that the Plaintiffs were simply not reappointed — as opposed to being otherwise discharged — affects the constitutionality of his actions. The critical fact for our purposes is that the termination of the Plaintiffs' employment with the Sheriff's Office was not the Plaintiffs' decision. See Branti v. Finkel, 445 U.S. 507, 512 n. 6, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980).

. “The 'right of free association [is] a right closely allied to freedom of speech and a right which, like free speech, lies at the foundation of a free society.’ ” Cromer v. Brown, 88 F.3d 1315, 1331 (4th Cir. 1996) (quoting Shelton v. Tucker, 364 U.S. 479, 486, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960)).

. We note that in cases in which the Elrod-Branti exception applies, and an employer thus can terminate his employees for political disloyalty, he may also terminate them for speech that constitutes such disloyalty. See Jenkins v. Medford, 119 F.3d 1156, 1164 (4th Cir. 1997) (en banc) (holding that because pleadings established that Elrod-Branti exception applied, deputies failed to state a First Amendment speech retaliation claim that deputies were dismissed for campaigning against the sheriff).

. We do not address whether Sandhofer, Woodward, or Bland could be terminated for lack of political allegiance because, as we will discuss, they have not created genuine factual disputes regarding whether lack of political allegiance was a substantial basis for their non-reappointment.

. gee Stott, 916 F.2d at 142; Zorzi v. County of Putnam, 30 F.3d 885, 892 (7th Cir. 1994) (dispatchers not involved in law enforcement activities or policy, so political affiliation inappropriate job requirement).
The dissent manifests a misunderstanding of our holding. It applies only to those who meet the requirements of the rule as we state it, and does not extend to all 13,600 officers in North Carolina, as the dissent suggests.

. Amended Complaint, ¶ 19.

. Both men also verbally expressed their support for Adams to several people, and although both had volunteered and worked vigorously for Roberts’s past campaigns, they did not volunteer at all for Roberts in the 2009 election.

. McCoy testified that he "was approached by ten or 15 people” who asked him why he would risk his job with the posting when he was only 18 months away from becoming eligible for retirement. J.A. 162. Indeed, McCoy eventually took his posting down.

.Jones was named Ramona Larkins at the time.

. Carter’s wife was also a Sheriff's Office employee.

. According to Carter’s declaration, Carter worked for the Sheriff’s Office for more than 11 years, performed his job "in an exemplary manner,” and always received performance evaluations of "above average.” J.A. 568. Neither his first- nor his second-level supervisor indicated at any time prior to his termination that they had any concerns regarding his performance. Carter conceded that he had had several disciplinary actions taken against him for mistakes he made in allowing prisoners to be released prematurely. However, the only formal discipline in his record was more than five years old at the time he was not reappointed, and the Sheriff did not testify that those past disciplinary actions played any part in his decision not to reappoint Carter.

. The Sheriff testified that he also considered the fact that Dixon transferred multiple times between working in the jail and in civil process after requesting to be a training officer but later deciding that he could not handle the pressures of that position.

. Indeed, even Bland's wife did not know that he favored Adams.

. The Supreme Court has rejected the notion that online speech is somehow not worthy of the same level of protection as other speech. See Reno v. ACLU, 521 U.S. 844, 870, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997); see also Ashcroft v. ACLU, 542 U.S. 656, 124 S.Ct. 2783, 159 L.Ed.2d 690 (2004).

. Indeed, in holding that an ordinance banning signs at residences except for those signs fitting within particular exceptions violated the plaintiff-resident's free-speech rights, the Gilleo Court highlighted several aspects of displaying political signs at one's residence that apply as well to liking a Facebook campaign page:
Displaying a sign from one’s own residence often carries a message quite distinct from placing the same sign someplace else, or conveying the same text or picture by other means. Precisely because of their location, such signs provide information about the identity of the “speaker.” ...
Residential signs are an unusually cheap and convenient form of communication. Especially for persons of modest means or limited mobility, a yard or window sign may have no practical substitute.
City of Ladue v. Gilleo, 512 U.S. 43, 56-57, 114 S.Ct. 2038, 129 L.Ed.2d 36 (1994).

. At oral argument, the Sheriff argued for the first time that McCoy did not actually intend his statement of support to be posted on the Campaign Page, and thus that the message did not constitute speech. That McCoy may have intended his expression of support to be kept private rather than made public, however, does not deprive it of its status as speech. See, e.g., Rankin v. McPherson, 483 U.S. 378, 387, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987) (holding that constable’s office employee engaged in protected speech when she made a private political remark that was overheard by a third person she did not realize was in earshot).

. Although the language of the Eleventh Amendment does not explicitly apply to suits brought against a state by one of its own citizens, the Amendment has been construed to bar such suits. See Equity in Athletics, Inc. v. Department ofEduc., 639 F.3d 91, 107 n. 12 (4th Cir.2011).

. "[A] State's sovereign immunity is a personal privilege which it may waive at pleasure.” College Sav. Bank v. Florida Prepaid Postsecondaiy Educ. Expense Bd., 527 U.S. 666, 675, 119 S.Ct. 2219, 144 L.Ed.2d 605 (1999) (internal quotation marks omitted). However, there is no indication of any waiver in this case. Nor has there been any Congressional abrogation of the Commonwealth’s immunity. See Lee-Thomas v. Prince George’s Cnty. Pub. Sch., 666 F.3d 244, 249 (4th Cir. 2012) (" 'Congress may abrogate the States’ Eleventh Amendment immunity when it both unequivocally intends to do so and acts pursuant to a valid grant of constitutional authority.' ” (quoting Board of Tntstees of Univ. of Ala. v. Garrett, 531 U.S. 356, 363, 121 S.Ct. 955, 148 L.Ed.2d 866 (2001))).

. Other courts have, at times, also described Jenkins’s holding broadly. See, e.g., Hall v. Tollett, 128 F.3d 418, 428 (6th Cir.1997) (stating that Jenkins “held that political affiliation is an appropriate requirement for deputy sheriffs”); Fields v. County of Beaufort, 699 F.Supp.2d 756, 764 (D.S.C.2010) ("The Fourth Circuit determined that the office of deputy is that of a policymaker, and therefore, the deputies were lawfully terminated for political reasons.”).

. We emphasize that even a sheriff who read the specific holding of Jenkins as limited to North Carolina deputies involved in law enforcement could still have reasonably concluded that, if we were squarely presented with the issue, we would hold that a sheriff could terminate any of his deputies for political reasons regardless of their particular duties.

. “[Ojnly infrequently will it be 'clearly established’ that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a particularized balancing that is subtle, difficult to apply, and not yet well-defined.” DiMeglio v. Haines, 45 F.3d 790, 806 (4th Cir.1995) (internal quotation marks omitted); see also McVey v. Stacy, 157 F.3d 271, 277 (4th Cir.1998).

. Plaintiffs maintain that the Sheriff is not entitled to qualified immunity because the Sheriff’s testimony demonstrated that he actually realizes that he cannot fire his emplees on the basis of their political opposition to him. However, qualified immunity depends not on what the actual sheriff knew at the time of his deposition but on what a hypothetical, objectively reasonable sheriff would have known in December 2009.